UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| ROBERT RABUCK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:06-cv-288 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| _____ | ) | |

This is an action for benefits brought pursuant to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks reinstatement of long-term disability benefits (LTD) under a policy of insurance provided by his former employer, Precision Manufacturing Group, LLC. The policy was written by Hartford Life and Accident Insurance Company (Hartford). The insurance policy (AR 797-826) contains all the operative provisions regarding payment of LTD benefits and for all intents and purposes is the ERISA plan. Hartford paid plaintiff LTD benefits under the plan from January 24, 2004 until May 2005, when Hartford terminated LTD benefit payments, finding that plaintiff was no longer disabled because he was capable of working full-time in his own occupation as a company president. Hartford denied plaintiff's appeal. On April 28, 2006, plaintiff filed this lawsuit.

Pursuant to the requirements of the case management order (docket # 13), the parties have now filed the administrative record (AR)(docket # 17) and their briefs addressed to the

procedural and substantive issues involved in this case.  (docket #'s 19-22).  Under *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), the court's review of plaintiff's claim under ERISA must be based upon the administrative record alone.  The parties have consented to the dispositive jurisdiction of a magistrate judge.  (*See* Consent and Order of Reference, docket # 14).  Upon review of the administrative record, the court finds that Hartford's decision to terminate plaintiff's LTD benefits and its decision to deny plaintiff's appeal were arbitrary and capricious and cannot withstand judicial review.

## Findings of Fact

### A.    Plaintiff's Occupation and Employer

1.    Plaintiff is the former President of Precision Manufacturing Group, LLC (Precision Manufacturing), which does business under the name Servometer.  The company designs and manufactures custom precision components, principally the production of precision electroformed bellows and related products.  (AR 405, 407, 412-15).  Mr. Rabuck became Precision Manufacturing's president in January 2001.  (AR 323, 325).  As company president, Mr. Rabuck  reported to the company's board of directors.  The company defined its president's duties and responsibilities as follows:

- •    Effectuate Operating Agreement;
- •    Direct and supervise the day to day operation of the Company;
- •    Preside over all meetings of the Members[;]
- •    Be the official spokesperson for the Company and be the person primarily responsible for conducting transactions with the Company's attorney and accountant[;]
- •    Sign, on behalf of the Company, such deeds, mortgages, bonds, contracts or other instruments that have been properly authorized to be executed by the Members[;]
- •    Establish such charges fo[r] services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company[;]

- Employ and maintain the necessary talent to effect the start up and operations of the Company and set and adjust wages and rate of pay for all personnel of the Company and shall appoint, hire and dismiss all personnel and regulate their hours of work[;]
- Have charge over the books and financial affairs of the Company and shall keep the Members advised in all matters pertaining to the operations of the Company, services rendered, operating income and financial position[;]
- Be custodian of the Company records and seal of the Company[;]
- Keep a register of the post-office address of each Member[;]
- Sign the authorization Certificates of Membership in the Company[;]
- Have general charge of the Certificate of transfer books of the Company[;] and
- Have charge and custody of all funds and securities of the Company and be responsible therefore and for the receipt and disbursement thereof.

(AR 317, 505).

**B.     The Plan**

2.     The LTD plan is embodied in a policy of group insurance issued by the Hartford, effective July 1, 2001 (AR 797-826) (hereinafter "Policy"). The Policy covered the "Active Full-time Salaried Employees" of Precision Manufacturing. (AR 801). The Policy provided for the payment of long-term disability benefits after an "Elimination Period." The Elimination Period is defined as "the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following: 1. the first 3 consecutive month(s) of any one period of Disability; or 2. with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program." (AR 801).

3.     The Policy contains the following statement regarding interpretation of the Policy's terms and conditions:

> **Who interprets the terms and conditions?**
> We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

(AR 811).  "**We, us** or **our** means the Hartford Life and Accident Insurance Company."  (AR

815).

4.      Disability is defined as follows:

> **Disability or Disabled** means that during the Elimination Period and for the
> next 24 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse;
>                * * *
> from performing one or more of the Essential Duties of Your Occupation, and as a
> result Your Current Monthly Earnings are no more than 80% of your Indexed Pre-
> Disability Earnings.
>
> After that, you must be prevented from performing one or more of the Essential
> Duties of Any Occupation.[1]

(AR 812).

5.       "Essential Duty" and "Your Occupation" are defined terms:

> **Essential Duty** means a duty that:
> 1.  is substantial, not incidental;
> 2.  is fundamental or inherent to the occupation; and
> 3. can not be reasonably omitted or changed.
> To be at work for the essential number of hours in your regularly scheduled
> workweek is also an Essential Duty.

(AR 812).

> **Your Occupation**, if used in this Booklet-certificate, means your occupation as
> recognized in the general workplace.  Your occupation does not mean the specific job
> you are performing for a specific employer or at a specific location.

(AR 815).

---

[1] "Any Occupation means an occupation for which you are qualified by education, training or experience, and that has the earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance."  (AR 812).

6.      LTD disability benefits are payable when five conditions are met: (1) the employee becomes Disabled while insured under the Plan; (2) the employee is Disabled throughout the Elimination Period; (3) the employee remains Disabled beyond the Elimination Period; (4) during the Elimination Period the employee was under the regular care of a physician, and the employee continues under the regular care of a physician; and (5) the employee submits a satisfactory Proof of Loss.  (AR 803).  "Benefits accrue as of the first day after the Elimination Period and are paid monthly."  (AR 803).

7.      The Policy deals with "Proof of Loss" as follows:  "All proof submitted must be satisfactory to us."  Proof of Loss expressly includes the claimant's signed authorization for Hartford to "obtain and release: a) medical, employment and financial information; and b) any other information we may reasonably require."  (AR 810).  It includes Hartford's  right to require the claimant to undergo an "examination":

> **What additional Proof of Loss are we entitled to?**
>
> We may have you examined to determine if you are Disabled.  Any such examination will be:
>
> 1.      at our expense; and
>
> 2.      as reasonably required by us.

(AR 810).

8.      The Policy specifies seven circumstances under which benefit payments would be terminated:

> We will terminate benefit payment on the first to occur of:
> 1. the date you are no longer Disabled as defined;
> 2. the date you fail to furnish Proof of Loss, when requested by us;

3.  the date you are no longer under the Regular Care of a Physician, or refuse a request that you submit to an examination by a Physician;

4.  the date you die;

5.  the date your Current Monthly Earnings exceed:

      a) 80% of your Indexed Pre-disability Earnings if you are receiving benefits for being disabled from Your Occupation; or

      b) an amount that is equal to the product of your Indexed Pre-disability Earnings and Benefit Percentage if you are receiving benefits for being disabled from Any Occupation;

6.  the date determined from the Maximum Duration of Benefits Table shown in the Schedule of Insurance; or

7.  the date no further benefits are payable under any provision in this plan that limits benefit duration.

(AR 804).

9.      Hartford's Policy required that the claimant apply for social security disability benefits:

**When must one apply for Social Security Benefits**?

You will be required to apply for Social Security disability benefits when the duration of your Disability meets the minimum duration required to apply for such benefits.  If the Social Security Administration denies your eligibility for benefits, you will be required:

1.      to follow the process established by the Social Security Administration to reconsider the denial; and

2.      if denied again, and we agree to pay the costs, to request a hearing before an Administrative Law Judge of the Office of Hearings and Appeals.

(AR 810).

10.     Precision Manufacturing purchased Group Insurance Policy GLT-680510 (Policy) through

Hartford, effective on July 1, 2001.   Plaintiff was an insured under the Policy.

**C.      Plaintiff's Heart Attack and Heart Transplant**

11.     On May 8, 2002, Robert Rabuck, then 53 years old,  was transported to the emergency room

of the Medical College of Ohio Hospital via Lifeflight.  (AR 608).  His condition became

unstable, "requiring intubation and emergent cardiac catheterization."  (AR 508, 618).  The

intubation was traumatic.  It caused severe bleeding and a significant amount of aspiration of gastric contents. (AR 619).  Mr. Rabuck's condition "deteriorated further in the cardiac catheterization laboratory where he suffered ventricular tachycardia/ventricular fibrillation arrest and cardiopulmonary resuscitation was done."  (AR 508, 611, 639).   During catheterization plaintiff suffered a hemodynamic collapse. (AR 639, 641).  Hospital records state, "In the process of performing the angioplasty the patient was transitioned from intra-aortic balloon pump to CPS due to hemodynamic collapse and recurrent refractory ventricular fibrillation with poor response to multiple defibrillations." (AR 641).  Mr. Rabuck was hypotensive and unresponsive for forty minutes. (AR 619).  He was treated for repeated episodes of ventricular fibrillation.  (AR 611, 639).  Mr. Rabuck was placed on cardiopulmonary bypass support and stabilized with intravenous vasopressors.  (AR 508). "Cardiac catheterization findings included cardiogenic shock, left anterior descending artery obstruction, left circumflex artery occluded just after the first obtuse marginal branch and an occluded right coronary artery proximally."  (AR 506).  Plaintiff's May 9, 2002 echocardiogram showed severely depressed left ventricular function. (AR 646).  The CT scan of plaintiff's lung bases showed "moderately large bilateral pleural effusions."  It also indicated free fluid in plaintiff's deep pelvis. (AR 631).

12.    On May 10, 2002, plaintiff underwent surgery for placement of an intra-aorta balloon pump. (AR 638-39).  His May 10, 2002 neurological examination reflected that he was "comatose" and was being maintained on a ventilator.  (AR 619-22).  Plaintiff did not respond to any stimulus, including verbal and painful stimuli.  Mr. Rabuck had a negative corneal reflex. (AR 621).  The neurological examination's "problem list" included "cardiogenic shock, AMI

and anoxic brain injury." (AR 623). When plaintiff emerged from his coma he was able to respond to verbal commands, squeeze with his hands, lift his limbs, move his toes, but could not see and was unable to follow a moving object. G. Tietjen, M.D., the attending physician, provided a diagnosis of "anoxic encephalopathy" and stated that plaintiff's ability to follow verbal commands suggested "a relatively good prognosis for moderate to good neurologic recovery." (AR 624). In an effort to evaluate plaintiff's decreased vision, a CT scan of his brain was conducted on May 11, 2002. It did not show evidence of intracranial bleeding. (AR 633, 772).

13.     On May 13, 2002, doctors believed that plaintiff had sufficiently recovered to survive another surgical procedure. They decided to implant a left ventricular assist device because plaintiff "still did not have an adequately working heart." (AR 647-48). A ventricular assist device (VAD) is a mechanical pump that helps a heart that is too weak to pump blood through the body. It is sometimes referred to as a "bridge to transplant" since it can help a patient survive until a heart transplant can be performed. (AR 416-24). A surgical pathology report indicated that plaintiff's heart muscle tissue showed "severe acute and chronic ischemic change." (AR 637). Approximately six hours after plaintiff's initial VAD placement surgery, he required an additional surgery because the VAD had malfunctioned, and plaintiff had experienced hemodynamic instability. (AR 649-50). On May 19, 2002, plaintiff underwent yet another surgery involving revision of the left VAD. (AR 651-52).

14.     Plaintiff's Ohio hospitalization lasted for more than a month. (AR 506-07, 604-52, 770-75). On June 27, 2002, Mr. Rabuck was discharged to Columbia Presbyterian Hospital for further recovery. Plaintiff was added to Columbia Presbyterian Hospital's heart transplant list. The

-8-

Ohio discharge summary provided a one-paragraph summary of plaintiff's lengthy hospital treatment.   Among other things, it states, "Once anoxic brain injury was ruled out, arrangements were made to place a left ventricular device, which occurred on 05/13/2002." (AR 604).  The discharge summary included the following list of medical complications that plaintiff had experienced:

> Ventricular tachycardia/ventricular fibrillation arrest, atrial fibrillation, ischemic hepatitis, aspiration pneumonitis, axonic enchalopathy, acute tabular necrosis and acute renal failure, respiratory failure, acute respiratory distress syndrome, pancreatitis and a short term memory deficit.

(AR 506, 604).  The discharge summary described plaintiff's condition on June 27, 2002 as "good," but stated that plaintiff's short-term memory deficit persisted.  (AR 506, 604).

15.   Although medically prohibited from driving (AR 507, 605), plaintiff nonetheless returned to work at Precision Manufacturing on July 17, 2002.  (AR 316).  He worked with the assistance of his ventricular assistance device during the months he was awaiting his heart transplant.  (AR 316, 331).

16.   On October 8, 2002, plaintiff underwent a heart transplant, and his left ventricular assist device was removed.  (AR 661-62; *see also* AR 443-44).  Plaintiff remained hospitalized until October 23, 2002.  (AR 327).  Plaintiff returned to work in December of 2002.  (AR 331).

17.   On March 14, 2003, plaintiff was hospitalized when testing revealed a bone marrow suppression of unknown etiology and a suspected allograft rejection.  (AR 299, 658).

18.   New York Presbyterian Hospital records dated April 2, 2003, show that plaintiff's treating cardiologist, Mario Deng, M.D., of Columbia University's College of Physicians and

Surgeons, provided plaintiff with the name and address of a physician plaintiff could contact in Hannover, Germany, if plaintiff experienced medical complications during a work-related trip to Germany from April 5, 2003 to April 12, 2003.  (AR 296, 584-86).

19.    On April 24, 2003, plaintiff's edema was "3+" and doctors initiated treatment with "TED stockings."  (AR 583).  May 2, 2003 progress notes indicate that plaintiff was working between 8 and 10 hours per day, five days a week, and that he was experiencing fatigue. (AR 294).  Plaintiff's edema was persistent.  (AR 581).

20.    On June 19, 2003, plaintiff experienced an acute rejection episode involving his transplanted heart.  (AR 253, 284, 291, 711; *see also* AR 455).  Plaintiff's legs displayed significant edema.  (AR 580).

21.    Plaintiff was hospitalized again on July 14, 2003.  He had a three-day history of diarrhea and dark stools.  Plaintiff had recently lost 10 pounds.  On the date of his admission, plaintiff had chills and a fever of 101 degrees.  (AR 281, 285-88, 525, 569-76, 653-57).   Hospital admission notes state, "patient who has a type A personality has agreed to stay at least overnight."  (AR 680, 684).   Doctors determined that plaintiff had experienced upper gastrointestinal bleeding.   Plaintiff was treated with transfusions and a proton pump blockade.  Endoscopies showed healing ulcers in the antrum as well as the descending colon. Plaintiff required intravenous antibiotics for treatment of staphloccal bacteremia. (AR 509).

22.    On August 7, 2003, Dr. Deng described plaintiff's heart condition as stable.  (AR 277).

### D.  Precision Manufacturing's Board of Directors Requests Plaintiff's Resignation

23. "From December 2002 through September 2003 [Precision Manufacturing's] Board attempted to work with Mr. Rabuck as a Board member and CEO but found he was incapable of performing the duties of CEO due to memory loss and related complications.  He was asked to resign as CEO in September 2003."  (AR 331).  "Mr. Rabuck's memory loss adversely affected his ability to work with the Board, employees and customers.  He would repeat himself constantly, ask the same questions repeatedly during conversations and then become agitated and confrontational when realizing his memory issue or having it brought to his attention.  Precision Manufacturing Group is a small, high technology business and there were no other positions available for Mr. Rabuck, especially given his memory loss problem.  The Board attempted to work with and accommodate Mr. Rabuck, but it was not feasible."  (AR 331).  Plaintiff's last day of work as Precision Manufacturing's president was September 5, 2003.  (AR 323, 945).

### E.  Application for Long-Term Disability Benefits

24. On September 8, 2003, plaintiff filed his application for LTD benefits.  (AR 138, 252, 314, 323-29, 945-51).  Two days later, as required by the Policy, he applied for social security benefits.  (AR 321).  Hartford was provided a copy of plaintiff's application for social security disability benefits.  (AR 77).

25. On September 11, 2003, plaintiff's heart condition was described as stable.  Plaintiff's blood pressure was 150/94.  (AR 276, 565).

26.    On September 16, 2003, Hartford's claims examiner Joseph Wojcik conducted a telephone interview.  Plaintiff related his history of a heart implant in April of 2002 and a heart transplant in October 2002.  Plaintiff stated that his current treatment consisted of multiple medications, regular office check-ups, and regular heart tissue biopsies to monitor possible rejection of his transplanted heart.  (AR 77).  Plaintiff reported that he continued to experience memory problems, and was unable to sustain prolonged activities.  He became fatigued easily and had no endurance.  Plaintiff stated that he did not expect that he would be able to return to work at any occupation.  Hartford's notes concerning this telephone conversation indicate that plaintiff "was difficult to talk to, became upset quite easily" and that the interview was "kept short."  (AR 78).  Hartford's examiner sent plaintiff a letter on September 16, 2003, acknowledging Hartford's receipt of his application for LTD benefits.  Hartford stated that when it had completed its investigation, plaintiff would be notified of the outcome.  (AR 31).

27.    On September 16, 2003, a CT scan of plaintiff's chest showed a small right pleural effusion, nodular densities of the lower left lobe of unknown clinical significance, and a ventral hernia.  (AR 176).  A MUGA scan on the same date indicated qualitatively normal right and left ventricle functions.  (AR 203).

28.    On September 16, 2003, Hartford developed its "Claim Management Plan."  Hartford's examiner wrote that plaintiff's attending cardiologist, Dr. Deng of Columbia University, did not appear to have assigned restrictions that would prevent plaintiff from returning to work.  (AR 77).  Hartford's Claim Management Plan was to request detailed explanations of

plaintiff's inability to work from his physician, to confirm the date plaintiff last worked as a result of his heart condition, and to obtain plaintiff's earnings records.  (AR 77).

29.    On October 7, 2003, a Hartford's examiner wrote to Dr. T. Walsh at the Medical College of Ohio Hospital requesting, "Any inpatient or outpatient hospital records for the period of May 1, 2002 to the present." (AR 30).  The letter specifically requested the report of examination on admission, the history sheet, and the final discharge summary.  (AR 30, 76).  The same day, after reviewing plaintiff's file and conferring with plaintiff's former employer, the examiner concluded that Dr. Walsh's records "were not necessary" because plaintiff had worked during the months after his heart attack and before his heart transplant:

> Prompted by call to clmnt about medical records.  I reviewed the file and again spoke with Andrea Badalamenti.  The clmnt did not have any period of disability from 11/4/02 to 9/5/03, he worked.  This would eliminate the need for medical records dating to 5/02.  With a ldw [last date of work] of 9/5/03, BED [benefit effective date] would not be until 12/03.  Concentration should now be on his medical condition at the time of BED.  Will request office notes from Dr. Deng in early November with request that he complete PCE [a physical capacity evaluation].  Do not need records from Dr. Walsh, it is documented that the clmnt had a heart transplant in 10/02.

(AR 76).

30.    On October 9, 2003, Dr. Deng noted that plaintiff's blood pressure remained high.  Plaintiff indicated that he generally felt well, but that his feet hurt when he walked. (AR 165, 556).  Plaintiff's exercise stress test indicated an estimated ejection fraction of 53%.  (AR 167).  Echocardiography indicated at least mild mitral regurgitation and trace tricuspid valve regurgitation.  (AR 168-71).

31.    Hartford received plaintiff's medical records from Dr. Walsh at the Medical College of Ohio Hospital sometime before October 21, 2003.  (AR 75).

32.     Hartford's records dated October 21, 2003, under the heading "MCCM [medical clinical case manager] REFERRAL," show that Hartford was aware of the "extremely stressful" nature of plaintiff's occupation as a company president:

> Clmnt is a 56 yr old male who last worked on 9/5/03 due to headaches, chest pain, HTN. He is status post heart transplant 10/02. He was president of the company. Benefit effective date 12/6/03.
>
> In reviewing the medical records from Dr. Deng, it is noted that the clmnt was hospitalized twice in 2003 since having transplant. Records show clmnt experienced rejection symptoms. He had complaints of headaches and chest pain. Although the clmnt's own occupation is somewhat sedentary, this type of work involves extremely stressful situations.
>
> Medical information does appear to support a claim of disability throughout and beyond the elimination period of 9/6/03 through 12/6/03. The clmnt's condition does not appear that it would improve unless he has another transplant. I believe his condition would preclude him from rtw [returning to work] to his own occ [occupation].

(AR 75).

33.     On October 28, 2003, a nurse practitioner employed by Hartford drafted what she labeled as a "CCM functional assessment." Hartford's employee was dismissive of plaintiff's memory problem, and categorized it as being a subjective complaint, similar to plaintiff's claims of frequent fatigue and poor endurance. (AR 73). Hartford's nurse practitioner's report concluded with the following entry:

A:     CLMT HAS A JOB THAT IS SEDENTARY/LIGHT IN PHYSICAL DEMANDS BUT DOES INVOLVE HIGH LEVELS OF STRESS. HE WAS ABLE TO MAINTAIN HIS WORK DUTIES FOR THE PAST 10 MONTHS IN SPITE OF HIS CHRONIC MEDICAL PROBLEMS. HE DID HAVE SOME PROBLEMS WITH HIS BLOOD PRESSURE AT THE TIME HE LEFT WORKFORCE THIS DISABILITY\003 PERIOD BUT WE DO NOT HAVE ANY INFORMATION AFTER THAT. HIS LTD BENEFITS WILL NOT BECOME EFFECTIVE UNTIL 12/6/2003. CLMT INDICATES THAT HE HAS PROBLEMS WITH MEMORY, FATIGUE, AND ENDURANCE BUT THESE SYMPTOMS ARE NOT NOTED

IN ANY OF HIS OFFICE NOTES.  HE HAS HAD EPISODICAL MEDICAL PROBLEMS THAT TEMPORARILY CAUSED HIM TO STAY OOW [out of work] BUT HE HAS ALWAYS BEEN ABLE TO RTW [return to work] WITHIN A SHORT PERIOD OF TIME.  HE HAS HAD ONLY ONE EPISODE OF TRUE REJECTION SINCE HIS TRANSPLANT A YEAR AGO AND ONE OTHER ILLNESS THAT LANDED HIM IN THE HOSPITAL BUT ONLY KEPT HIM OOW FOR A SHORT TIME.  IT HAS BEEN ALMOST 2 MONTHS SINCE THE DATE OF THE LAST MEDICAL INFORMATION WE HAVE IN THE FILE AND AT THAT POINT THE CLMT WAS GOING FOR FURTHER DIAGNOSTIC TESTING.  WE WILL NEED TO FIND OUT WHAT THAT TESTING SHOWED AND HOW CLMT HAS DONE SINCE THEN.  IF HE IS AGAIN STABLE WILL NEED TO FIND OUT WHAT LIMITATIONS HE HAS NOW THAT WOULD KEEP HIM OOW AND WHY.  IT IS TOO EARLY NOW TO DETERMINE WHETHER HE WILL STILL BE DISABLED BY THE BENEFIT EFFECTIVE DATE IN DECEMBER.  WILL ALSO NEED TO GET AN OA [occupational assessment] TO SEE IF THIS JOB DEMAND IS THE SAME IN THE NATIONAL ECONOMY.

(AR 74).

34.   The following entry appears in Hartford's records for October 29, 2003:

10/29/03 RECEIVED A CALL FROM MARY THE NURSE ON THE TRANSPLANT TEAM.  SHE INDICATES THAT CLMNT IS STILL NOT MEDICALLY STABLE.  HIS BLOOD PRESSURES ARE STILL NOT WELL CONTROLLED.  HE ALSO WAS FOUND TO HAVE BILATERAL PLEURAL EFFUSIONS AND WILL BE RE-EVALUATED NEXT WEEK TO SEE IF THEY NEED TO DO ANYTHING ELSE.  HE IS NOW KEEPING A BLOOD PRESSURE DIARY SO THEY CAN GET A BETTER HANDLE ON HIS BLOOD PRESSURES.  WILL RETURN FILE TO EXAMINER FOR FURTHER HANDLING.  WOULD RECOMMEND F/U FOR UPDATED MEDICAL INFORMATION IN A FEW WEEKS TO ASSESS CLIMT'S CAPACITY CLOSER TO THE BENEFIT EFFECTIVE DATE.  IF HE IS MORE STABLE THEN HE MAY BE ABLE TO RTW.  S. WORLEY NP.

(AR 73).

35.   On December 6, 2003, the three-month benefit Elimination Period under the Policy ended.

36.   Sometime before December 9, 2003, Dr. Deng completed Hartford's Physical Capacities

Evaluation form.  Dr. Deng stated that in an eight-hour workday plaintiff could sit for two

hours, stand for one hour and drive for two hours.  He stated that plaintiff could occasionally

lift and carry a maximum of 10 pounds.  Plaintiff could occasionally "push/pull" a maximum of 10 pounds.  Dr. Deng stated that plaintiff should never climb, balance, crouch, crawl, or reach above shoulder level.  He could perform tasks requiring occasional feeling, fingering, handling, reaching at or below waist level, stoop and kneel.  Plaintiff could not perform work requiring repetitive use of his feet or hands.   Dr. Deng wrote that plaintiff was immunosuppressed and could not be exposed to dust, mold, spores, construction sites, fresh flowers, colds or flu.  Dr. Deng indicated that plaintiff had reached his maximum medical improvement and that the restrictions imposed were permanent.  Dr. Deng did not indicate that plaintiff could return to work at his regular occupation or in a lighter duty occupation. (AR 232-33, 910-11).

37.     Dr. Deng's January 8, 2004 progress notes record plaintiff's complaints of loss of short-term memory function.  (AR 162, 555).  A cardiac catheterization biopsy on that date did not indicate evidence of rejection of the transplanted heart.  (AR 195).  Progress notes state that plaintiff continued to experience lower extremity neuropathy.  (AR 162).

38.     On January 9, 2004, a Hartford examiner summarized his telephone conversation with Dr. Deng as follows:

> Spoke with Dr. Deng.  He reports that although the clmt is considered stable post transplant, the clmnt remains high risk for heart failure.  He has multiple medical problems including uncontrolled hypertension, renal failure, and bleeding ulcers. Clnmt's blood levels are monitored regularly.  Yesterday's blood work showed clmnt's creantine to be high with triglycerides over 400.  In addition, Dr. Deng reports that the clmnt's immune system is diminished making him susceptible [] to colds and infections which in his case could be fatal.  He does not believe that the claimant can rtw to own occ.  His opinion for any occ is guarded due to the chronic medical problems that the clmnt is suffering from.

-16-

(AR 69). Thereafter, the examiner wrote that plaintiff was approximately fifteen months post heart transplant. Plaintiff continued to suffer from hypertension, renal failure, depressed immune system and bleeding ulcers. He noted that Dr. Deng had indicated that plaintiff's condition might stabilize, "it would most likely not improve." (AR 68). The examiner concluded that plaintiff had presented satisfactory Proof of Loss to establish that he was disabled from performing the Essential Duties of his occupation. Plaintiff did not appear to be a rehabilitation candidate and would be encouraged to pursue a social security disability claim. Given the "high benefit" payable by Hartford to plaintiff, plaintiff's file was referred to another Hartford examiner for a "sign off." (AR 69). On September 16, 2004, the second examiner agreed with the recommendation and approved plaintiff's claim for LTD benefits. (AR 69).

**F.      Hartford's Approval of Mr. Rabuck's Application for LTD Benefits**

39.    On January 20, 2004, Hartford notified plaintiff that his claim for long-term disability benefits had been approved. (AR 25, 224). Hartford's notice stated, "Benefit payments will continue, subject to the terms and limitations of the policy, while you meet the policy definition of Disability." (AR 25). "In no event, however, [would] benefits be payable beyond 04/12/2013." (AR 26).

40.    Hartford's notice (AR 26) advised plaintiff that Hartford intended to reduce plaintiff's monthly LTD benefits by $1,602.00, based on Hartford's estimate of plaintiff's social security disability benefit award.

-17-

### G.  Hartford's Demands After January 20, 2004

41.  After Hartford began paying plaintiff LTD benefits, Hartford's employees started calling and writing to plaintiff and/or his treating cardiologist on an extremely frequent basis, directing them to complete various forms and to submit requested records.

42.  On February 25, 2004, Hartford's examiner Wojcik directed plaintiff to provide Hartford with an "update about your application for Social Security Disability (SSD) benefits." (AR 23). Hartford anticipated that the Social Security Administration would find that plaintiff was totally disabled. Therefore, Hartford reduced Mr. Rabuck's LTD benefits:

> We do have information that you did apply for Social Security Disability on September 5, 2003. According to our records, if the Social Security Administration were to award you benefits, the benefit effective date would be March 1, 2004. To date we have not been provided with information showing that the Social Security Administration has made a decision about your claim. As a result, we are placing an estimated Social Security award on your claim in the amount of $1602 effective April 1, 2004. Your Current Monthly Benefit would be reduced by this amount.

(AR 23, *see also* 67). Hartford's letter advised plaintiff of the steps Hartford would require him to take if the Social Security Administration denied his application for disability benefits. (AR 23).

43.  On March 17, 2004, Hartford's examiner Steven Craven contacted plaintiff by telephone. (AR 66). Plaintiff reported that he was unable to tolerate physical activity and that he did not anticipate being able to return to work in any occupation. (AR 67). Plaintiff stated that he had received a telephone call from the Social Security Administration indicating that he would be awarded disability benefits, but had no further details. Examiner Craven, "Advised him [that] he may [have] be[en] overpaid" and directed plaintiff to provide Hartford with a copy of his social security disability award when he received it. (AR 67).

-18-

44.    On March 30, 2004, Mr. Craven wrote a letter to plaintiff directing plaintiff to provide the

following:

> On January 20, 2004 and February 25, 2004 we wrote to you, requesting completion
> of a LTD Payment Options and Reimbursement Agreement. Our February 25, 2004
> letter asked you to complete a Claimant Questionnaire and Social Security
> Administration Consent for Release of Information. To date, we have not received
> any of these forms, which are needed to properly document your LTD claim.
> Therefore, we have enclosed additional copies of these forms, which you should
> complete in full and return to our office by April 20, 2004.
>
> In addition, once you receive your Notice of Award for Social Security Disability
> (SSD) benefits from the Social Security Administration, we ask that you forward a
> copy to our office. Please be advised that if we do not receive either your SSD award
> or completed Social Security Authorization form by April 20, 2004, we will have no
> alternative but to calculate an overpayment on your LTD claim based on an estimate
> of your SSD rate. A self-addressed envelope is included for your convenience in
> replying.

(AR 22).

45.    On April 11, 2004, plaintiff signed Hartford's Claimant Questionnaire. (AR 221). Plaintiff

reported that he suffered from a severe cognitive impairment which made it difficult to

manage either his finances or his medications. (AR 217). On April 11, 2004, plaintiff also

signed the form authorizing the Social Security Administration to release information

regarding his social security disability benefits to Hartford. (AR 221). Finally, plaintiff

signed Hartford's "LTD Payment Options and Reimbursement Agreement." (AR 222). The

document stated that the policy provides that LTD benefits will be reduced by the amount

of any other income benefits which plaintiff was eligible to receive. The agreement specified

that plaintiff's social security disability benefits were "other income" benefits. Plaintiff

selected "Option A" of the Agreement which states: "Please estimate the amount of my

monthly income benefits and reduce my monthly long term disability benefit by this amount.

The Hartford will adjust my monthly LTD benefit rate when they receive proof showing the other income benefits awarded or proof of denial."  (AR 222).

46.    On April 21, 2004, Hartford's examiner Craven wrote to the Social Security Administration stating, "We insure the above named individual for Long Term Disability benefits."   (AR 19).  Hartford specified the information it required from the Administration "[i]n order to determine the correct benefit payable."  (AR 19).  Enclosed with Mr. Craven's letter was plaintiff's signed authorization for the release of information by the Administration.

47.    On April 21, 2004, Mr. Craven wrote letters on Hartford's behalf addressed to Dr. Deng and plaintiff.  (AR 20, 21, 188, 846, 893).  The letter to Dr. Deng directed him to provide copies of his office notes for the period of October 10, 2003 through April 21, 2004.  It also directed Dr. Deng to complete an enclosed Physical Capacities Evaluation form.  (AR 21).  The letter to plaintiff asked him to contact Dr. Deng to ensure that Hartford received the requested information by May 12, 2004.  (AR 20).  Plaintiff was also advised that Hartford was not satisfied with his Other Income Questionnaire:

> In addition, the Other Income Questionnaire we received from you on April 14, 2004 was not completed and this information is needed to properly document your LTD claim.  Therefore, we have enclosed the Other Income Questionnaire, which you should complete in full and return to our office by May 12, 2004. . . . .

(AR 20).

48.    On April 26, 2004, Mr. Craven spoke with plaintiff on the telephone regarding plaintiff's social security disability benefits and its impact on Hartford's payment of LTD benefits.  (AR 65).

-20-

49.   On April 27, 2004, Dr. Deng signed another physical capacities evaluation form indicating that plaintiff could work a maximum of 4 hours per day, but indicated that plaintiff had an improved exertional capacity.  (AR 834-35).

50.   The Social Security Administration determined that plaintiff was disabled, and it awarded benefits effective March 2004.  (AR 16, 125).  On April 27, 2004, the Social Security Administration provided Hartford with the statement Hartford had requested concerning plaintiff's social security disability benefits.  (AR 64, 212-13).

51.   Plaintiff's April 29, 2004 cardiac catheterization did not reveal any evidence of medical complications. (AR 155, 158). Dr. Deng's notes described plaintiff as being "cardiac stable." (AR 157).  Plaintiff complained of decreased endurance and lower extremity edema.  (AR 554).  The words "golfing/fishing" appear at the bottom of the same page, with nothing else to provide context.  (AR 157).  Plaintiff's April 29, 2004 "lymphocyte growth assay result" indicated that plaintiff was "at high risk for a high-grade cellular rejection within the next three months."  (AR 357).

52.   On June 5, 2004, Mr. Craven wrote plaintiff a letter directing that plaintiff provide Hartford with a personal check or money order for $2,412.05 within fifteen days.  Hartford had calculated that plaintiff's receipt of social security disability benefits during the period of March 1, 2004 through May 31, 2004, had resulted in an overpayment of $2,412.05.  (AR 16).  Hartford directed plaintiff to provide it with documentation confirming the date his

New Jersey disability benefits expired.  (AR 18).[2] Mr. Craven's letter concluded with a request that plaintiff contact Dr. Deng on Hartford's behalf:

> Finally, on April 21, 2004 we wrote to Dr. Deng, requesting his office notes and test reports on you since October 10, 2003, as well as his completion of a Physical Capacities Evaluation Form on you.  Subsequently, on May 3, 2004 we received Dr. Deng's completed Physical Capacities Evaluation Form and his test reports on you through April 29, 2004; however, we have not received Dr. Deng's office notes on you since October 10, 2003, which are needed to evaluate your continued eligibility for LTD benefits.  Therefore, we ask that you contact  Dr. Deng to ensure that the requested office notes are submitted to our office by June 21, 2004.

(AR 18).

53.     On June 7, 2004, a Hartford employee conducted an occupational analysis limited to the physical exertional requirements of the occupation of company president:

> An Occupational Analysis has been completed and the Essential Duties and corresponding demands for EE's OWN OCCUPATION for ER [exertional demands] (L[I]GHT) are greater than OWN OCCUPATION in the NATIONAL ECONOMY (SEDENTARY) as defined and classified in the Title President DOT [Dictionary of Occupational Titles] Code: 189.117-026; Plans, develops, and establishes policies and objectives of business organization in accordance with board directives and corporation charter.
>
> OWN JOB:    sit/stand/walk frequently
> OWN OCC:    lift 10# max

(AR 63).

54.     On June 10, 2004, Mr. Craven contacted plaintiff by telephone.  Plaintiff reported that he continued to experience problems with his short-term memory and endurance.  Plaintiff's wife performed most of the household chores.  Mr. Craven again inquired regarding

_____

[2]Plaintiff apparently complied with this request.  The record includes a New Jersey notice stating that as of March 5, 2004, plaintiff's 26-week benefit maximum had been reached.  (AR 181).

plaintiff's social security disability benefits.  Plaintiff related to Mr. Craven of the social

security disability benefits that plaintiff was then receiving.  (AR 62).

55.     On June 10, 2004, Mr. Craven wrote letters directed to plaintiff and Dr. Deng.  (AR 14, 15).

His letter to Dr. Deng enclosed a paper identified as an Occupational

Description/Occupational Requirements form and requested the following information from

Dr. Deng:

> Enclosed is a copy of the Occupational Description/Occupational Requirements for
> Mr. Rabuck's occupation as a President.  Based on your review of this vocation
> information, we ask that you provide our office with a narrative report on Mr.
> Rabuck's medical condition.  Your narrative should state the most recent date Mr.
> Rabuck was examined, his current physical limitations and restrictions as well as his
> current and future course of treatment.
>
> In addition, your narrative should provide your opinion whether or not Mr. Rabuck
> is able to perform the essential duties of his occupation as a President on a full time
> basis, including the clinical data/findings that support your opinion.  When returning
> your narrative report to our office, we ask that you include your office notes on Mr.
> Rabuck since October 2003 (the records we received from you May 3, 2004 are your
> test reports on Mr. Rabuck and we need your actual office notes on Mr. Rabuck as
> well since October 10, 2003).  We also ask that you submit the requested medical
> information to our office by July 1, 2004.

(AR 15).  Hartford's letter to plaintiff requested that plaintiff contact Dr. Deng and ask him

to provide Hartford with the requested information on or before July 1, 2004.  (AR 14).

56.     On June 14, 2004, Mr. Craven received a call from "Clmt's partner" stating that every effort

was being made to provide Hartford with the medical information that Hartford had

requested.  Mr. Craven's notes  recorded that, "Clmt's partner asked why we were harassing

the clmt."  (AR 61).

57.     On July 8, 2004 (AR 13) and August 20, 2004 (AR 12), Mr. Craven sent plaintiff letters

advising him that Dr. Deng had not provided a "narrative report" that Hartford had requested,

and stated that if Hartford did not receive the report on or before September 10, 2004, plaintiff's LTD benefits would be terminated:

> As stated in our July 8, 2004 letter to you, the narrative report we requested from Dr. Deng is needed to evaluate your continued eligibility for LTD benefits. Therefore we ask that you contact Dr. Deng to ensure the requested narrative report is submitted to our office by September 10, 2004 or we will have no alternative but to terminate your LTD claim.

(AR 12).

58.    Plaintiff's July 22, 2004 echocardiography revealed mild mitral valve regurgitation and tricuspid regurgitation. His left atrium was mildly enlarged. (AR 145). Plaintiff's ECG was classified as abnormal, showing "ST & T wave abnormality" and an "early R wave transition." (AR 143-44, 147, 526).

59.    On August 2, 2004, Mr. Craven called plaintiff and left a message stating that if he did not receive the requested medical information, he would be referring plaintiff's file for termination. (AR 60). Plaintiff returned Mr. Craven's call on August 3, 2004. Plaintiff stated that he had written and e-mailed Dr. Deng, and that he had been told in response that all the requested medical information had been sent to Hartford. (AR 60).

60.    On August 10, 2004, Mr. Craven indicated that his management plan for plaintiff's file was to send one more request for the narrative report to Dr. Deng, and that if Dr. Deng did not reply, plaintiff's benefits would be terminated. (AR 59).

61.    Mr. Craven's notes regarding an August 30, 2004 telephone call state as follows:

> Clmt's partner called, stating that she has had no success in getting a reply from Dr. Deng, that we should try calling Sue Cech (transplant coordinator that works under Dr. Deng) to clarify what is needed further as far as a narrative. Clmt's partner asked what we needed further and why is this info needed, as they are being told that all req med info submitted to Hartford. I stated that I cannot discuss the specifics of the file

with her, I would call Sue to see if she can assist in having req narrative submitted by Dr. Deng.  I did state that ultimately it was the responsibility of the claimant to ensure req med info submitted.

(A.R. 59).

62.     On September 2, 2004, Dr. Deng provided a lengthy written response to Mr. Craven's inquiry:

Mr. Rabuck is a gentleman currently 57 years old who underwent orthotopic heart transplantation on October 8, 2002.  Preceding he had an acute myocardial infarction in May of 2002 while on a fishing expedition and required care at Ohio State University including an emergency left main artery stenting-angioplasty procedure as well as left ventricular assist device implantation May 13, 2002, as well as a mechanical circulatory support device bridge to heart transplantation.  After transfer to Columbia University, he was transplanted, as mentioned above on October 8, 2002.

After heart transplantation, he underwent, according to Columbia University Medical Center Protocol, triple immunosuppression with overall stability regarding acute and chronic rejection episode.

He had a recent hospitalization in July 2003 for an upper gastrointestinal bleed originating July 4, 2003, and reversing on appropriate treatment that included blood transfusion and proton pump blockade.  The control endoscopies showed healing ulcers in the antrum as well as descending colon.   In addition, he required intravenous antibiotic for staphylococcal bacteremia.

Following an acute treatment in 2003, Mr. Rabuck continued to be monitored in our Outpatient Transplantation Center at Columbia University Medical Center . . . until he decided to relocate to Michigan in spring 2004.

His current medications include Neoral 100 mg am and 75 mg pm, CellCept 1500 mg twice a day, prednisone 5 mg am, Pravachol 40 mg qd, Ecotrin 81 mg qd, Lasix 40 mg qd, Cardizem 90 mg bid, enalapril 10 mg qd, multivitamin Materna 1 tablet qd, Citracal 3 tablets per day, ferrous gluconate 325 mg per day, Protonix 40 mg bid, Colace 100 bid as needed, Zetia 10 mg qd, and K-Dur 20 mEq qd.

The last biopsy performed on April 29, 2004, showed absence of acute cellular rejection and normal hemodynamics, with a right atrial pressure of 9mm Hg, wedge pressure of 14 mmHg, pulmonary oxygen pressure of 27/16/21, a pulmonary artery saturation of 71%.  The biopsy grade was 1A (absence of relevant acute cellular

-25-

rejection). Last echocardiogram performed on July 22, 2004, showed normal left and right systolic and diastolic function with only minor mitral regurgitation and tricuspid regurgitation.

In summary, Mr. Rabuck, at age 57, suffers from ischemic cardiomyopathy with an acute coronary event in May 2002, followed by a left ventricular assist device previous to heart transplantation, successful heart transplantation on October 8, 2002, currently in New York Heart Association Functional Class of 0-I. He has a very satisfactory post transplantation course regarding his transplanted heart function. As with all transplantation and organ recipients in general, the ongoing lifelong triple immunosuppression requires a very detailed protocol of post transplantation events monitoring with an appointment every three months that include clinical visit, laboratory tests, electrocardiogram, x-rays, and either echocardiogram, or biopsies with right heart catheter. Based on this, his overall functional capacity although satisfactory is not quite back to complete normality because of the mentioned possibilities of rejection but also immunosuppression associated infection, renal dysfunction, bone dysfunction, neurological dysfunction, psychiatric dysfunction, gastrointestinal dysfunction, and skin dysfunction. With this in mind, returning to precision-type manufacturing will be difficult. A part-time employment based on his daily disposition is feasible.

(AR 139-40, 508-09, 842-45; *see also* AR 459-77).

63.    On September 16, 2004, Mr. Craven expressed his opinion that the medical evidence did not appear to support the level of restriction specified by plaintiff's treating cardiologist, Dr. Deng. (AR 58).

64.    Plaintiff had a squamous cell carcinoma surgically removed from his right forearm on September 2, 2004. (AR 551, 750, 753).

65.    On November 4, 2004, the Social Security Administration issued a Notice of Change in Benefits to Mr. Rabuck. The notice specified that the Social Security Administration was increasing plaintiff's benefit amount to give him credit for additional earnings that were not included in the Administration's earlier benefit calculations. (AR 136-37). The notice was forwarded to Hartford. (AR 135). On December 17, 2004, Hartford acknowledged its

receipt of the notice.  It further advised that the increase in social security benefits had resulted in an overpayment to plaintiff which was immediately deducted from plaintiff's December 2004 LTD disability benefit payment.  (AR 11).

66.   On January 14, 2005, Mr. Craven wrote a letter to Dr. Deng.  (AR 9-10, 119-20).  This letter acknowledged receipt of Dr. Deng's September 2, 2004 response to Mr. Craven's inquiry. The letter represented that telephone calls had been placed to Dr. Deng on November 3 and November 12, 2004, and further represented that messages had been left "asking for a part-time return to work note for Mr. Rabuck, including the date Mr. Rabuck [could] return to work part-time, the number of hours he [could] start working at, as well as [Dr. Deng's] plan to increase Mr. Rabuck's hours to full time."  (AR 9, 119).  Mr. Craven's letter asserted that plaintiff's occupation as generally performed in the national economy did not require performing precision-type manufacturing, and directed Dr. Deng to provide updated medical records and a specific plan for plaintiff's return to work on a full-time basis:

> As shown on the enclosed Occupational Description/Occupational Requirements for Mr. Rabuck's occupation as company President, his occupation in the national economy is a Sedentary occupation that does not require performing precision-type manufacturing. Your September 2, 2004 narrative states that Mr. Rabuck's April 29, 2004 biopsy was normal and his July 22, 2004 echocardiogram showed normal systolic/diastolic function with only minor mitral/tricuspid regurgitation.  In order to evaluate Mr. Rabuck's continued eligibility for LTD benefits, we find additional information on Mr. Rabuck's medical condition is needed from you.

> Therefore, we ask that you provide our office with a brief narrative stating the date Mr. Rabuck can return to work part-time, the number of hours he can start working at, as well as your plan to increase Mr. Rabuck's hours to full time.  We also request that you provide our office with your office notes/test reports on Mr. Rabuck since July 23, 2004.  A self-addressed envelope is included for your convenience in replying by February 4, 2005.

(AR 9).

67.   On January 28, 2005, Dr. Deng provided the following written response to Mr. Craven's

inquiry:

> Thank you very much for your letter dated January 14, 2005, related to my patient,
> Robert Rabuck.
>
> As you summarized, on September 2, 2004, we detailed or assessment that based on
> his history of ischemic cardiomyopathy, status post HeartMate I [] Assist Device
> Transplantation on May 15, 200[2] and heart transplantation on October 8, 200[2],
> with an overall satisfactory status post heart transplantation, he would be capable of
> returning to part-time work, in his position as company president.  This assessment
> is based on an assumption of an overall satisfactory posttransplantation course.  The
> posttransplanatation  course with some likelihood of rejection episodes, infection
> episodes, and also organ dysfunction episodes related to imunosuppressive therapy
> make it likely that part time employment which in our opinion can start as of
> February 1, 2005, will continue indefinitely.  Thus, we do not have a current plan of
> transitioning to full-time employment.[3]

(AR 116, 121, 150).

68.   February 2005 echocardiography indicated that plaintiff was "tachycardic."  His left atrium

was mildly dilated and his left ventricle appeared to by hypertrophied.   Mild mitral

regurgitation was observed.  (AR 547).

69.   A February 14, 2005 entry in Hartford's case management plan recorded that, "Dr. Deng

continues to feel that no FT [full-time] RTW [return to work] will ever be possible based on

the high likelihood of rejection/infection/organ dysfunction -- according to Dr. Deng.  Dr.

Deng feels that these MAY occur because of EE's [the employee's] ongoing

immunosuppressive TX.  Dr. Deng has no plan in mind for any increase in working hours

back to FT."  (AR 49).  The entry went on to state the following:

> Because EE [the employee] remains in the Own Occupation phase it would be
> reasonable to contact the ER [employer] to see if they can take EE back in a PT [part-

---

[3]There is no evidence in the record that an occupation of part-time company president exists.

-28-

time] capacity.  There is also the issue of whether or not the job is currently available w/EE's former ER.  The issue of Dr. Deng not wishing to project that EE can ever RTW [return to work] full time can be further explored/addressed once EE has in fact gone back to work.  We may wish to pursue a Peer review of the file by the UDC [University Disability Consortium] to determine when and if EE has the capacity for full time work.

(AR 49).

70.    Hartford's March 3, 2005 records reflect Hartford's awareness that it was "very unlikely" that plaintiff's employer would take plaintiff back as company president on a part-time basis. (AR 47).  The Hartford examiner was "unsure that EE could not perform his own occupation on a full time basis, based on the apparent 'preventative' measures outlined by the [attending physician] AP."  The entry concluded, "in terms of liability, we agreed possibly more appropriate to address maximum function at this time."  (AR 47).

71.    Hartford's records dated March 23, 2005, show that it intended to move forward with UDC Peer review.  Ms. French, a nurse employed by Hartford, stated that she was "unsure of the medical soundness of Dr. Deng's position that at PR RTW would be less risky for ee than a FT RTW . . . ."  (AR 46).

72.    On April 27, 2005, Joseph A. Vita, M.D., generated a document captioned as a "Medical Record Review of Robert Rabuck."  (AR 96-99).  This document is not written on the letterhead of any medical practice or company.  No address of employment is supplied for Dr. Vita.  The letter-report is addressed to Ms. Cynthia French at a Hartford's Syracuse office.  Dr. Vita's name appears at the end of the letter, followed by a statement that Dr. Vita is board certified in cardiology.  (AR 99).  The terms under which Hartford paid for Dr. Vita's review of Mr. Rabuck's records are not specified.  Elsewhere in the record there is an

-29-

invoice from University Disability Consortium to Hartford in the amount of $1,125.00 consisting of a $112.50 administrative fee and $1,012.50 for Dr. Vita's time attempting to contact Dr. Deng by telephone, reviewing plaintiff's medical records, and preparing Vita's 4-page letter-report.  (AR 109).  Dr. Vita summarized his assignment from Hartford as follows: "I am asked to review medical records on Mr. Robert Rabuck and speak to the attending cardiologist.  I am asked to comment on his work capacity."  (AR 96).  Dr. Vita documented his unsuccessful efforts to contact Dr. Deng by telephone over a one-week period in April 2005.[4]  Dr. Vita never spoke to plaintiff's treating cardiologist, Dr. Deng.  Dr. Vita never examined plaintiff or treated plaintiff.  Dr. Vita did not perform any tests, or even reference any medical or vocational literature supporting his conclusions.  Vita's discussion of approximately three years of plaintiff's medical records spans a total of less than two full pages of double-spaced text.  (AR 96-97).  The fourth page of Vita's letter-report, other than a single sentence, is devoted to Dr. Vita's signature.  The remaining page, plus the sentence that carried over onto page 4, states as follows:

> SUMMARY AND COMMENT: The claimant is a 58-year-old man with ischemic cardiomyopathy and heart transplantation in 2002.  The available notes indicate that the claimant has done well and has an excellent functional capacity, including the ability to play golf and fish.  He is on a typical medical regimen to prevent rejection and treat his blood pressure and hypercholesterolemia.  Repeated notes indicate that his cardiac condition is stable.  Although immunosuppressed, return to work is not contraindicated in heart transplant patients.  Typically, such patients must take care about contact with individuals with possible infections, use measures such as hand sanitizers, and to avoid mold, dust, and temperature extremes, as indicated by Dr. Deng.

---

[4]Although the exact terms on which Dr. Vita agreed to review files for Hartford are not available, what has been produced reveals that Vita was under significant time pressures to provide Hartford with his report.  Records show that Dr. Vita requested and obtained a one-week extension of his deadline to provide Ms. French with his final report.  (AR 43).

In his letter from 9/2/2004, Dr. Deng listed a number of systems that had the potential to be "dysfunctional", but presents no evidence that any of these conditions are present or are limiting the claimant. Based on the available records, I do not find Dr. Deng's arguments convincing. In my opinion, the claimant has the functional capacity to return to full-time (8 hours/day) sedentary work, with the restriction that he avoid direct contact with individuals with possible infection, use a hand sanitizer, and avoid mold, dust and temperature extremes.

RESPONSE TO SPECIFIC QUESTIONS:[5]

1.      Do you find any clinical rationale for the position that this claimant can return to work part time as a company president, but lacks the capacity to work at that occupation full time?

I find no convincing clinical rationale for this position. The records suggest that the claimant is NYHA Class I and is capable of full time sedentary work.

2.      Dr. Deng has stated that he has no return to work plan for this claimant. Do you find medical support to limit the claimant long term in this way?

As noted above, I find no medical support for this limitation.

3.      Does the claimant retain the functional capacity to engage in full time, essentially sedentary level work that would include PC activities, keyboarding, chairing meetings, etc.?

All of this occupational activity could be completed in a typical office environment to which the claimant has been released on a part time basis. Dr. Deng has assigned no other restrictions or limitations to the duties the claimant could perform as company president.

In my opinion, the claimant has the functional capacity to engage in full time, essentially sedentary level work.

(AR 98-99).

73.    Hartford never requested or required that plaintiff undergo physical or mental status examinations by any medical professional. At all times, Hartford restricted its inquiry to review of medical records by persons Hartford had employed or retained for that purpose.

---

[5]The questions were posed by Hartford through Cyntia French. (AR 115).

74.    On May 9, 2005, Susan L. Cech, a cardiac transplant nurse practitioner at New York
Presbyterian Hospital, wrote that plaintiff's condition warranted consultation services by a
lipid specialist.  Plaintiff's tests showed: "tchol 245, trig 826, and HDL of 49."  (AR 514).

75.    On May 12, 2005, Ms. French noted Hartford's receipt of Dr. Vita's report.  French wrote,
"A consensus of opinion has been reached between this office and that of Dr. Vita,
cardiologist for UDC, that EE retains the FCP to RTW, FT to his own former SED. level
occupation as Company President.  Dr. Deng has declined to be included in a physician to
physician discussion about Dr. Vita's Peer review of this file and was advised in the AP
notification letter that if the UDC physician was unable to speak w/him about this review we
would have no option but to base a final determination of the function on the information
already at hand and the conclusions of Dr. Vita."  (AR 42).

76.    Hartford's file contained the Dictionary of Occupational Titles (DOT) code for president, any
industry (189.117-026).  It indicated that the general educational development required for
company president is as follows:  "Reasoning, Level 5; Mathematics, Level 5; Language,
Level 5."  (AR 182).  The skilled nature of the position of company president is reflected in
specific vocational preparation level of  8 (4-to-10 years).  The occupation is classified as
sedentary in its exertional requirements.  Sedentary work involves lifting, carrying, pushing
or pulling up to 10 pounds occasionally.  Sedentary work is primarily performed while
sitting, but may involve standing or walking for brief periods of time.  (AR 182).  Hartford's
file also contained an O*NET SOC Code classification for private sector executives: 11-
1011.02.  The tasks listed for this occupation reflect significant responsibilities and rigorous
mental demands:

Tasks:

1.  Confers with company officials to plan business objectives, to develop organizational policies to coordinate functions and operations between divisions and departments, and to establish responsibilities and procedures for attaining objectives.

2.  Reviews activity reports and financial statements to determine progress and status in attaining objectives and revises objectives and plans in accordance with current conditions.

3.  Directs and coordinates formulation of financial programs to provide funding for new or continuing operations to maximize returns on investments, and to increase productivity.

4.  Plans and develops industrial, labor, and public relations policies designed to improve the company's image and relations with customers, employees, stockholders, and public.

5.  Evaluates performance of executives for compliance with established policies and objectives of firm and contributions in attaining objectives.

(AR 183, 887).

## H.   Hartford's Termination of Mr. Rabuck's LTD Benefits

77.   On May 27, 2005, Mr. Craven sent plaintiff a six-page letter notifying plaintiff that Hartford would no longer consider plaintiff disabled after May 31, 2005.  (AR 2-7).  Hartford based its termination of plaintiff's LTD benefits on its conclusion that as of June 1, 2005, plaintiff was capable of performing all the Essential Duties of his occupation as a corporate president on a full-time basis.  Mr. Craven's termination letter represented that, "all papers contained in your file were reviewed as a whole."  Omitted from the list of papers that followed (AR 4) was any mention of the Social Security Administration's determination that plaintiff was "totally disabled."  Mr. Craven's letter likewise avoided any reference to the medical records regarding plaintiff's memory loss and other nonexertional impairments, such as pain, and fatigue.  Craven's letter included the following discussion of vocational requirements:

-33-

> To continue to receive LTD benefits, you must meet the definition of Disability above.  In order to do this, you must be unable to perform the duties of Your Occupation.  The Job Description and other Employer information in your file show that Your Occupation is President.  The Occupational Analysis completed by a Vocational Rehabilitation Clinical Case Manager shows that the Essential Duties of Your Occupation in the general workplace include: conferring with company officials to plan business objectives, develop organizational policies to coordinate functions and operations between divisions and departments, review activity reports and financial statements to determine progress and status in obtaining objectives, direct and coordinate formulation of financial programs to provide funding for new or continuing operations, plan and develop industrial/labor and public relations policies, evaluate performance of executives for compliance with established policies and objectives.  To perform these duties, you must be able to lift/carry/push/pull 10 pounds occasionally, sit mostly with brief periods of time standing or walking, occasionally reach/handle and finger.

(AR 4).  The termination letter ignored plaintiff's nonexertional impairments and their impact on plaintiff's ability to perform "one or more of the Essential Duties" of his occupation as company president.  (AR 812).  The letter mentioned plaintiff's appeal rights under ERISA, and indicated that plaintiff should direct his appeal letter to "Claim Appeal Unit, Benefit Management Services, Hartford Life Insurance Company, P.O. Box 2999, Hartford, Connecticut."  (AR 6).

78.   On June 25, 2005, John D. Call, M.D., began treating plaintiff for hyperlipidemia.  Plaintiff related his lengthy list of medications and reported that he had trouble sleeping, lacked energy, experienced pain in his feet and ankles, "numbness and tingling in his feet, kidney problems and hearing problems."  (AR 720, 740).  A lipid profile showed plaintiff's "triglycerides of 565, cholesterol 219, and HDL 47."  (AR 721, 741).

79.   On August 8, 2005, plaintiff required emergency room treatment at North Ottawa Community Hospital for his painful right great toe.  (AR 737-39, 742-45).  In September 2005, plaintiff's toe continued to be inflamed, warm and painful despite having been treated

with Prednisone.  Dr. Call consulted with his colleagues, who stated that heart transplant patients have an increased incidence of gout.  (AR 719).  On October 3, 2005, plaintiff was examined by a rheumatologist, J. Howard Uhl, M.D., of Arthritis Specialists of Western Michigan.  (AR 724-25).  Dr. Uhl agreed with the diagnosis of gout, and reiterated that, "gout is a fairly common event in heart transplant patients."  (AR 734).

80.   On January 5, 2006, plaintiff's treating cardiac surgeon, Dr. Deng, completed a "Physician's Statement of Disability."  (AR 511-513).  Dr. Deng stated that plaintiff had suffered and would continue to suffer from short-term memory loss.  (AR 514).  Plaintiff would also require chronic immunosuppression maintenance.  Dr. Deng indicated that plaintiff is required to ingest "up to 50 different medications, daily."  (AR 512; *see also* AR 718).  "As with all heart transplantation and organ recipients in general, the ongoing triple immunosuppression requires a very detailed protocol of posttransplantation event monitoring with an appointment every three months that include clinical visit, laboratory tests, electrocardiogram, x-rays and either echocardiogram or biopsies with right heart catheter."  (AR 512-13).  Dr. Deng stated that the following environmental restrictions were required:

> Mr. Rabuck must refrain from the following environmental hazzards:
>
> - construction sites
> - dust
> - mold
> - fumes and temperature extremes since he is chronically immunosuppressed, therefore, making him susceptible to infection and may lead to the rejection of his transplanted heart.

(AR 513).  Dr. Deng stated that, "Mr. Rabuck's functional capacity is not expected to improve because of the mentioned possibilities of rejection but also immunosuppression,

associated infection, renal dysfunction, bone dysfunction, neurological dysfunction, psychiatric dysfunction, gastrointestinal dysfunction and skin dysfunction." (AR 513). Dr. Deng concluded with the following statements regarding plaintiff's disability:

> It is my medical opinion that Robert Rabuck's complete disability existed on May 8, 2002, and continues indefinitely.

> I understand that Robert Rabuck attempted to return to work on a part-time basis, but was unsuccessful due to the medical conditions described above. This fact constitutes clinical evidence of his inability to continue working as of May 8, 2002.

> It is evident that Robert Rabuck is disabled from part-time and full-time employment.

> It is my further opinion that Robert Rabuck is unable to perform one or more of the material duties of his own occupation.

> Furthermore, Robert Rabuck is unable to perform one or more of the essential duties of any occupation.

(AR 513).

## I.     Mr. Rabuck's Appeal of Hartford's Termination of his LTD Benefits

81.     On January 16, 2006, plaintiff filed his appeal of Hartford's decision terminating his LTD benefits. (AR 81, 384-400). Plaintiff attached eighteen exhibits in support of his appeal of Hartford's termination of benefits. (AR 400). Hartford assigned the appeal to Daniel Connors. (AR 401-02).

82.     On February 20, 2006, Hartford again referred plaintiff's file to UDC. This time, Hartford presented UDC with the following referral questions:

> 1.     Please define the claimant's functional limitations from 6/1/05 and beyond.

> 2.     Given the claimant's entire cardiac medical history when would he be capable of returning to work on a part-time basis? Full time basis?

(AR 37-76).  Hartford's referral form did not identify what records Hartford provided UDC. Plaintiff's occupation as company president is not mentioned.  (*Id.*).  The same day, Hartford's appeal specialist, Mr. Connors, sent a letter to Dr. Deng at Columbia University indicating that sometime in the indefinite future "a physician from University Disability Consortium may contact you by telephone for clarification of Mr. Rabuck's medical condition and functional status."  (AR 377).

83.  On March 8, 2006, Phillip J. Podrid, M.D., generated a report which he addressed to Mr. Connors at Hartford.[6]  (AR 345-54, 362-71).  The opening sentence of Podrid's report stated that Mr. Rabuck was an "engineer" rather than a company president.  (AR 345).  Dr. Podrid concluded that plaintiff did not have any active "cardiac problems" that would limit his functional capacity.  Dr. Podrid did not address any of plaintiff's non-cardiac problems.  Dr. Podrid opined that, "Mr. Rabuck does not have any physical limitations and could return to full time work without restrictions."  (AR 353).  Podrid was dismissive of Dr. Deng's conclusions that plaintiff was unable to work overtime and extended hours, stating that such "emotional problems" would be best evaluated by a psychological specialist.  Hartford did not direct that plaintiff undergo such an evaluation.  Dr. Podrid expressed an opinion that plaintiff would have been capable of part-time work in September 2003 and "could likely return to full time work by January 2005."  (AR 353-54).  UDC billed Hartford $1,710.00 for Dr. Podrid's file review.  (AR 344).

_____

[6]The administrative record includes two versions of Dr. Podrid's report: (1) what appears to be a draft version which contains no reference to UDC (AR 362); and (2) a version appearing on the letterhead of "University Disability Consortium: Physician Specialists for Disability Evaluation and Management."  (AR 345).

Two days before Dr. Podrid completed his report, he had contacted Dr. Deng by telephone. Dr. Podrid's March 8, 2006 fax begins with the sentence, "Thank you for taking time out of your busy schedule to talk with me on March 6, 2006 about your patient Mr. Robert Rabuck." (AR 355). The next sentence indicates that the contents of the fax are a "summary" of the conversation "as well as [Dr. Podrid's] review of the medical records." (AR 355). There is no evidence of a give-and-take exchange of medical opinions regarding plaintiff's ability to perform the requirements of work. Nothing in the fax suggests that Dr. Podrid offered any opinion during the conversation or invited plaintiff's treating cardiologist to comment on Podrid's opinion(s). What can be discerned from Podrid's summary is that plaintiff's work as a company president had involved working long hours, and that Dr. Deng did not believe that plaintiff could withstand the strain of that occupation. (AR 356).

84. On March 14, 2006, Ms. Christina Fleisher of Hartford's Syracuse office sent an e-mail to Mr. Connors. She provided the following in response to Mr. Connors's inquiry whether work in excess of 40 hours was customary in the general workplace for company presidents: "Long hours, including evenings and weekends, are standard for most top executives and general managers . . . ." (AR 341). Fleisher stated that plaintiff's own occupation, as he had performed it, was at the light exertional level. As generally performed in the national economy, the occupation of company president occupation is performed at a sedentary exertional level. Ms. Fleisher noted that the Dictionary of Occupational Titles (189.117-026) indicated that a company president plans, develops, and establishes policies and objectives of business organization in accordance with the board's directives and corporation's charter. (AR 341).

85. Hartford's records reflect a March 10, 2006 telephone conversation between Mr. Connors at Hartford and Joe Kirwin at Precision Manufacturing:

> Claimant was the CEO and attempted to return to work after his heart transplant he believes in the fall of 2003. He was having memory loss and could not remember what he had said 5 minutes earlier. He would go to the floor and tell someone to do something and then an hour later tell them to do something differently from before. He needed to be able to provide technical advice but was unable to do so with his memory loss. He was also acting erratically. They couldn't take him back. . . . While physically he may be able to work, his memory loss would not enable him to do so. He was terminated.

(AR 340). On March 14, 2006, Mr. Kirwin, on behalf of Precision's Board of Directors, faxed a letter to Mr. Connors at Hartford as a follow-up to their telephone conversation. Among other things, the Board's letter stated that plaintiff returned in December 2002 following his October heart transplant surgery. The Board attempted to work with plaintiff during the period from December 2002 through September 2003, but found that plaintiff was "incapable of performing the duties of CEO due to memory loss and related complications. He was asked to resign in September 2003." (AR 343). The Board's letter concluded with the following paragraph:

> Mr. Rabuck's memory loss adversely affected his ability to work with the Board, employees and customers. He would repeat himself constantly, ask the same questions repeatedly during conversations and then become agitated and confrontational when realizing his memory issue or having it brought to his attention. Precision Manufacturing Group is a small, high technology business and there were no other positions available for Mr. Rabuck, especially given his memory loss problem. The Board attempted to work with and accommodate Mr. Rabuck, but it was not feasible.

(AR 343).

-39-

86.     On March 15, 2006, Hartford denied plaintiff's appeal.  (AR 333).  Hartford's letter made

        a passing reference to the evidence submitted before the May 2005 termination of plaintiff's

        LTD benefits, but Hartford provided no substantive discussion of that evidence.  Hartford's

        letter listed twenty-one additional exhibits (eighteen from plaintiff and three from Hartford),

        but Hartford generally restricted its substantive discussion to item # 19, the opinion that

        Hartford had obtained from UDC's non-examining physician Podrid:

        1.      Research information LVAD
        2.      Patient's Guide to Heart Transplantation
        3.      Job Description
        4.      Medical College of Toledo Discharge Summary
        5.      Dr. Mario Deng 9/2/04 letter to The Hartford
        6.      Dr. Mario Deng 1/28/05 letter to The Hartford
        7.      Dr. Mario Deng Physician Statement of Disability
        8.      Medical Records of Dr. Mario Deng
        9.      Medical Records from Medical College of Toledo
        10.     Medical Records from New York Presbyterian Medical Center
        11.     Medical Records of John Call, Jr. MD
        12.     Medical Records of J. Howard Uhl, MD
        13.     Medical Records of Mary West, MD
        14.     North Ottawa Community Hospital
        15.     Jason Van Ittersum, MD
        16.     John Miner, MD
        17.     CT/Xray Reports
        18.     Daniel Grossier, MD
        19.     3/8/06 University Disability Consortium Medical Report
        20.     3/14/06 Letter from John Kirwin, III of Argosy Partners
        21.     3/14/06 Occupational Analysis.

        (AR 333-34).

87.     Hartford's letter denying plaintiff's appeal concluded with the statement, "It is our

        determination satisfactory proof of continued Disability beyond 6/1/05 from Mr. Rabuck's

        Own Occupation as it is performed in the general workplace and/or as required by his

        employer has not been provided.  Therefore, we are upholding the termination of his claim."

(AR 336).  Hartford advised Mr. Rabuck that his file was being closed, and that Hartford would entertain no further appeals.  Hartford's letter advised plaintiff of his right to bring a civil action pursuant to Section 502(a) of the Employee Retirement income Security Act of 1974 ("ERISA").  Plaintiff filed his complaint on April 28, 2006.

## Discussion

I.     **Standard of Review**

Generally, the court must determine whether an "arbitrary and capricious" or a *"de novo"*[7] standard of review applies to a decision to terminate a plaintiff's long-term disability benefits and the denial of an appeal.[8]  The *de novo* standard of review is the general rule, and the arbitrary and capricious standard of review is the exception.  A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*).  The Sixth Circuit "has read *Firestone v. Bruch* to hold that discretion is the exception, not the rule and that the arbitrary and capricious standard does not apply unless there is a *clear* grant of discretion to determine benefits or interpret the plan." *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (emphasis in original); *see Anderson v. Great West Life Assur. Co.*, 942 F.2d 392, 395 (6th Cir. 1991).  The party claiming entitlement to review under an arbitrary and capricious standard therefore has the burden of proving

---

[7]"When a court reviews a decision *de novo*, it simply decides whether or not it agrees with the decision under review." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).  The *de novo* standard of review applies to both the factual determinations and legal conclusions under review. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).

[8] "Traditional summary judgment concepts are inapposite to the adjudication of an ERISA action for benefits, brought under 29 U.S.C. § 1132(a)(1)(B), because the district court is limited to the evidence before the plan administrator at the time of its decision, and therefore, the court does not adjudicate an ERISA action as it would other federal civil litigation." *Buchanan v. Aetna Life Ins. Co.*, 179 F. App'x 304, 306 (6th Cir. 2006); *see Wilkins*, 150 F.3d at 617-19.  The administrative record includes documentation submitted during the appeals process. *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 511 (6th Cir. 2005).

that the standard applies.  *See, e.g., Brooking v. Hartford Life & Acc. Ins. Co.*, 167 F. App'x 544, 547(6th Cir. 2006).  While no particular language is necessary to vest the plan administrator with discretion to interpret the plan or make benefit determinations, the Sixth Circuit "has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'"  *Perez*, 150 F.3d at 555 (quoting *Wulf*, 26 F.3d at 1373) (italics and alteration in original)); *see Fendler v. CNA Group Life Assur. Co.*, No. 06-3245, 2007 WL 2623201, at * 3 (6th Cir. Sept. 7, 2007); *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 807 (6th Cir. 2002).

Here, it is undisputed that the arbitrary and capricious standard applies to Hartford's decisions to terminate plaintiff' LTD benefits and to deny his appeal.  The Policy states, "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.' (AR 811).  "**We, us** or **our** means the Hartford Life and Accident Insurance Company."  (AR 815).  Courts have consistently interpreted this or substantially similar policy language as providing discretionary authority and have applied the "arbitrary and capricious" standard to the administrator's determination.  *See Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006); *Hulet v. Hartford Life & Acc. Ins. Co.*, 1:06-cv-707, 2007 WL 2875287, at * 7 (W.D. Mich. Sept. 28, 2007).

"The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action."  *Smith v. Continental Cas. Co.*, 450 F.3d 253, 259 (6th Cir. 2006).  The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions.  *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007); *see Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006); *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004); *see also Elliott v. Metropolitan Life Ins. Co.*, 473

F.3d 613, 617 (6th Cir. 2006) ("Under that standard, we will uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it was supported by substantial evidence.'") (quoting *Glenn*, 461 F.3d at 666). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper*, 486 F.3d at 165 (quoting *Jones*, 385 F.3d at 661)). "Although review under the arbitrary and capricious standard is highly deferential, 'it is not no review, and deference need not be abject.'" *Smith*, 450 F.3d at 259 (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)); *see Elliott*, 473 F.3d at 617. "Rather, this standard requires us to review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Cooper*, 486 F.3d at 165 (quoting *McDonald*, 347 F.3d at 172); *see Gilchrest v. UNUM Life Ins. Co. of Am.*, No. 06-4133, 2007 WL 3037239, at * 4 (6th Cir. Oct. 17, 2007). The administrator must consider the entire record, not selected portions. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002); *Satterwhite v. Metropolitan Life Ins. Co.*, 2007 WL 2746886, at * 7. Furthermore, in performing a review under the arbitrary and capricious standard, a factor that the court must take into consideration the fact that Hartford was acting under a conflict of interest because it both determined and paid disability claims. *See Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 292 (6th Cir. 2005); *see also Glenn v. MetLife*, 461 F.3d at 666. The Sixth Circuit has remarked that where there is a monetary incentive for the insurance company or its claims administrator to deny the claim, "the potential for self-interested decision-making is evident." *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000).

-44-

**II.       Hartford's Decisions to Terminate Plaintiff's LTD Benefits and Deny His Appeal**

The court must determine (1) whether Hartford's termination of plaintiff's LTD benefits was arbitrary and capricious; and (2) whether Hartford's denial of plaintiff's administrative appeal of the termination was arbitrary and capricious. *See Cooper*, 486 F.3d at 165-69.

**A.       Termination of Benefits**

Hartford based its termination of plaintiff's long-term disability benefits on its conclusion that plaintiff was no longer disabled as defined by the Policy. (AR 6). Hartford relied on this Policy provision: "We will terminate benefit payment on the first to occur of: 1. the date you are no longer Disabled as defined." (AR 804).[9] Hartford terminated its payment of LTD benefits based on its finding that plaintiff was capable of performing the Essential Duties of his occupation as a corporate president on a full-time basis as of June 1, 2005. (AR 2-7).

The provisions of the Policy, as interpreted by the insurance company itself, require two separate inquiries. First, a medical determination must be made concerning the extent of the claimant's impairments and the functional capacity that the claimant retains in light of those impairments. This conclusion is generally stated both in terms of exertional capacity (*i.e.*, the claimant is capable of heavy, medium, light, or sedentary lifting requirements) and nonexertional restrictions (*e.g.*, claimant has a limited attention span, suffers cognitive deficits, must not stoop or bend, must not be exposed to irritating fumes or other irritants, or cannot operate or work near heavy machinery). Once this medical determination has been made, the second question is vocational in

---

[9]Hartford's termination letter (AR 2-6) did not discuss or rely on the alternative provisions of the Policy which allow it to terminate benefits on "2. the date you fail to furnish Proof of Loss, when requested by us; [or] 3. the date you are no longer under the Regular Care of a Physician, or refuse our request that you submit to an examination by a Physician." (AR 804).

nature: taking into account the claimant's functional capacity, along with his age, work experience, transferable skills and other relevant factors, is the plaintiff capable of performing the essential functions of his own occupation. Both the medical determination and vocational decision are subject to review under the arbitrary and capricious standard.

        1.      Medical Determination

        Hartford terminated plaintiff's LTD benefits based on Dr. Vita's opinion that plaintiff was capable of performing sedentary work. Dr. Vita rendered this opinion after conducting only a file review. (AR 6). Hartford's earlier payment of LTD benefits does not operate as an estoppel, but is a circumstance that weighs against the propriety of the Hartford's decision to discontinue those payments. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). The Plan clearly authorized Hartford to have plaintiff subjected to medical examinations to determine whether plaintiff was disabled within the meaning of the policy. (AR 810). Hartford elected not to exercise its rights in that regard. Hartford chose to support its decision with a file review rather than the results of a medical examination. Hartford's "decision to conduct a file review rather than a physical exam [is] just one more factor to consider in [the] overall assessment of whether [Hartford] acted, in an arbitrary and capricious fashion." *Calvert*, 409 F.3d at 295. There is nothing "inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296. "Failure to conduct a physical examination -- especially where the right to do so is specifically reserved in the plan -- may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." 409 F.3d at 295. This is such a case. Where, as here, the conclusions from a file review "include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Id.* at 297 n.6;

-46-

see *Proffitt v. Group Long Term Disability Plan for Family Practice Center*, 2:06-cv-97, 2007 WL 2692177, at * 9-10 (E.D. Tenn. Sept. 12, 2007); *Pitchurski v. Liberty Life Assur. Co. of Boston*, No. 06-11025, 2007 WL 892368, at * 11 (E.D. Mich. Mar. 21, 2007). "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005); *see Dorris v. Cummins Engine Co., Inc. Group Ins. Plan*, 470 F. Supp. 2d 797, 814 (M.D. Tenn. 2006).

        Defendant's brief repeatedly labels the file review conducted by Dr. Vita (and later Dr. Podrid) of University Disability Consortium (UDC) as being "independent." (Deft. Brief at 1, 7, 11, 13, 22). Nothing in the administrative record supports this assertion. Drs. Vita and Podrid were not Hartford employees. Hartford hired their services through UDC. However, the Supreme Court has observed that, "Physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers['] money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003); *see McDonald*, 347 F.3d at 171-72. In choosing an expert to assess a claim, the administrator is operating under a conflict of interest, providing it with a "clear incentive to contract with individuals who [are] inclined to find in its favor that [a claimant] is not entitled to continued [disability] benefits." *Kalish*, 419 F.3d at 507-08. Hartford's significant and ongoing relationship with UDC has been noted in several recent federal court decisions. For example, in *Powell v. Hartford Fin. Serv. Group, Inc.*, No. 1:06-cv-134-M, 2007 WL 773732 (W.D. Ky. Mar. 8, 2007), the district court permitted discovery in an ERISA case asserting a procedural challenge against the plan

-47-

administrator's decision to terminate LTD benefits on the basis of bias. "Through discovery, Powell [sought] to serve several interrogatories on defendant Hartford regarding the number of times Hartford has obtained a medical opinion concerning a claim for long-term disability benefits through UDC; the number of times UDC has supported Hartford's decision to deny a claim for long-term disability benefits; and the amount of money Hartford has paid UDC for its medical opinions relating to claims for long term disability benefits." *Id.* at * 1. Among other things, plaintiff had demonstrated that, "[A] Westlaw search, generated by using the terms 'Hartford' and 'University Disability Consortium' [] show[ed] that Hartford ha[d] used UDC in relation to disability claims at least 34 times since 1998." The court found that discovery with regard to the question of bias was appropriate given the evidence of the "significant and lengthy relationship" between Hartford and UDC. *Id.* at * 3; *see Finley v. Hartford Life & Acc. Ins. Co.*, No. C 06-6247-CW, 2007 WL 2406872, at * 5 (N.D. Cal. Aug. 20, 2007) ("Defendant Hartford [did] not address the potential conflict of interest arising from its 'volume discount type arrangement' with UDC and the fact that it is the only insurer with which UDC has a contract.").[10] Drs. Vita and Podrid have supplied Hartford with opinions in other cases supporting Hartford's decisions denying LTD benefits. *See Hairston v. Loctite Corp.*, No. 4:05 cv 1142 JLH, 2006 WL 568326, at * 7 n.2 (E.D. Ark. Mar. 7, 2006) (Podrid); *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 298 (6th Cir. 2006) (Vita).

---

[10]Other circuits have encouraged the use of independent medical examinations where there is a conflict of interest to best effectuate the purposes of ERISA. *See Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1015 (10th Cir. 2004); *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998).

Cases which indicate that administrators may consult with their own experts "do not stand for the proposition that an insurer may deny claims based only on the unsupported conclusions of its employees." *Curtin v. UNUM Life Ins. Co. of Am.*, 298 F. Supp. 2d 149, 157 (D. Me. 2004).

Dr. Vita's four-page report did not specify what records Hartford had supplied him with for purposes of his file review.  Notably absent from Vita's report was any discussion of plaintiff's medical records predating plaintiff's heart transplant.  The vagueness of Vita's report (*i.e.* "He [Mr. Rabuck] apparently underwent emergent coronary bypass surgery in May of that year [2002] and required LVAD support and a mechanical circulatory support device served as a bridge prior to transplant"(A.R. 96)) more than suggests that plaintiff's records from Medical College of Ohio, including the documentation of Mr. Rabuck's short-term memory deficits, were never provided to Dr. Vita.  (AR 506, 604).  *See Boyd v. American Elec. Power Sys. Long-Term Disability Plan*, No. 2:06-cv-161, 2007 WL 2778667, at * 6 (S.D. Ohio Sept. 21, 2007) ("The fact that plaintiff's LTD benefits were based on reviews of some but not all of the evidence suggests that defendant's decision was not based on a 'deliberate and principled reasoning process.'") (quoting *Glenn*, 461 F.3d at 666).  Vita's report lacks substantive analysis regarding plaintiff's work before and after his heart transplant, and that work's impact on plaintiff's health. Vita never addressed how Mr. Rabuck could safely work in the "high stress" environment of being a company president.  419 F.3d at 509.  Vita placed significant emphasis on plaintiff's "ability" to golf and fish and found that it indicated "excellent functional capacity." (AR 98).  The record does not contain evidence regarding the frequency or intensity of plaintiff's participation in either activity.  The words "golfing and fishing" appear in Dr. Deng's April 29, 2004 progress notes without any further information. (AR 157).  To conclude on this basis that plaintiff golfed and fished on a regular basis was patently speculative.  Dr. Vita never communicated with plaintiff or Dr. Deng.  Thus, Dr. Vita's emphasis on plaintiff's "ability" to play golf and fish (AR 97, 98) as an indicator of plaintiff's "excellent" functional capacity (AR 98) is largely conjecture, and has the overwhelming appearance of improper

"cherry-picking" the medical record, rather than a principled assessment of plaintiff's daily activities. *See Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 266 (6th Cir. 2007) (Cherry- picking the record for bits of information that could be read to support a denial of coverage is neither principled or reasoned.); *Satterwhite v. Metropolitan Life Ins. Co.*, 1:06-cv-165, 2007 WL 2746886, at * 11 (E.D. Tenn. Sept. 19, 2007) (collecting cases). Vita's report contains no discussion of any of plaintiff's numerous medications or their actual or potential impact on plaintiff's ability to perform the requirements of work. Vita's discussion of plaintiff's medical history is extraordinarily brief, spanning less than two double-spaced pages. (AR 96-97). Dr. Vita never examined plaintiff or treated plaintiff in any capacity. Nonetheless, he supplied Hartford with opinions stating that plaintiff could perform full-time sedentary work and that "no convincing clinical rationale" supported Dr. Deng's position that plaintiff could return to work part-time as a company president, but lacks the capacity to work at that occupation full-time. (AR 98-99). Nothing in the record suggests that Dr. Vita had any particular vocational expertise. *See McDonald*, 347 F.3d at 172.

In reviewing the medical evidence in an ERISA case, the court is not to apply the "treating physician rule" applicable in social security cases, in which the opinion of treating physicians is entitled to more weight than that of non-treaters. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003); *Cooper*, 486 F.3d at 167; *compare Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). However, it is well established that, "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 538 U.S. at 834. The claimant's documented functional limitations may not simply be dismissed as being "subjective exaggerations," particularly when the individuals purportedly making that credibility determination "never met or examined" the claimant. *Calvert*,

409 F.3d at 297; *Platt v. Walgreen Income Protection Plan for Store Managers*, 455 F. Supp.2d 734, 745 (M.D. Tenn. 2006) ("MetLife's consultants were not free to discredit plaintiff's subjective complaints of pain or its impact on his physical capacity without a physical examination."). Here, it appears that Hartford determined as early as October 28, 2003  (AR 73-74), that it was going to reject documented nonexertional impairments such as fatigue and memory loss and focus exclusively on plaintiff's exertional limitations.

In summary, the court finds, on this administrative record, the medical component of Hartford's decision to terminate plaintiff's LTD benefits was arbitrary and capricious.

### 2.    Vocational Determination

The vocational component of Hartford's decision to terminate plaintiff's LTD benefits cannot withstand scrutiny under the arbitrary and capricious standard.  Hartford terminated plaintiff's LTD benefits based on its finding that on and after June 1, 2005, plaintiff could perform the Essential Duties of his occupation of company president as performed in the general workplace. The Policy defined "Your Occupation" as the "occupation as recognized in the general workplace. Your occupation does not mean the specific job you are performing for a specific employer or at a specific location."  "Essential Duty" is defined as a duty that:  (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) cannot be reasonably omitted or changed.  (AR 812, 815). The Sixth Circuit has consistently held that a plan administrator responsible for terminating benefits under this type of long-term disability policy must (1) identify the type of jobs that the administrator believes plaintiff is capable of performing; and (2) make a sufficient inquiry into whether the jobs it has identified are jobs the claimant can reasonably perform in light of the

claimant's specific functional limitations.[11]  *See Brooking v. Hartford Life & Acc. Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. 2006) (Hartford's decision terminating disability benefits was arbitrary and capricious because the sedentary jobs Hartford had identified were not jobs that the claimant could reasonably perform in light of her specific disabilities.); *McDonald*, 347 F.3d at 172 (The administrator's decision was arbitrary and capricious because it terminated benefits without specifying the kind of work the claimant was capable of performing.); *accord Glenn v. Met Life*, 461 F.3d 660, 674 (6th Cir. 2006) (The administrator's termination of long-term disability benefits was found arbitrary and capricious where, among other things, the administrator's occupational skills analyst was provided with an inappropriately selective portion of the claimant's medical records.); *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 362 (6th Cir. 2002) (The decision terminating long-term disability benefits was arbitrary and capricious because the insurance company had provided its vocational consultant with a "cherry-picked" medical record that did not accurately reflect the plaintiff's functional limitations, and the resulting report from the vocational consultant could not support the termination of benefits because it was an "incomplete and inaccurate representation of [the plaintiff's] ability to work."); *Greencup v. Hartford Life & Acc. Ins. Co.*, No. 5:05-cv-105-R, 2006 WL 1133570, at * 3 (W.D. Ky. Apr. 26, 2006) ("[A] plan administrator not

---

[11] The Third Circuit's decision in *Havens v. Continental Cas. Co.*, 186 F. App'x 207 (3d Cir. 2006) is instructive.  The court observed that the determinations of the claimant's functional capacity and the occupation's requirements "must together be detailed enough to make a rational comparison possible.  Otherwise, the 'finding' that the claimant can perform alternate occupations consists only of a bald assertion."  *Id.*, at 212.  While it is appropriate to engage a vocational consultant to help identify occupations that the individual might be capable of performing, a consultant's report that merely mentions a few general factors and then lists a few jobs is inadequate.  *Id.*  "[I]t is not rational to defer to such experts in the absence of the threshold indication that their conclusions, in the words of Federal Rule of Evidence 702, are the product of 'reliable principles and methods . . . applied . . . reliably to the facts of the case.'"  186 F. App'x at 213.

only must specify what kind of work a claimant could perform, but must also 'make some inquiry into whether the jobs selected are ones that the claimant can perform in light of specific disabilities.'") (quoting *Brooking*, 167 F. App'x at 549).

Hartford's May 27, 2005 termination of benefits letter stated that the occupational analysis completed by its clinical case manager determined that the Essential Duties of plaintiff's occupation in the general workplace were as follows:

> conferring with company officials to plan business objectives, develop organizational policies to coordinate functions and operations between division and departments, review activity reports and financial statements to determine progress and status in obtaining objectives, direct and coordinate formulation of financial programs to provide funding for new or continuing operations, plan and develop industrial/labor and public relations policies, evaluate performance of executives for compliance with established policies and objectives. To perform these duties, you must be able to lift/carry/push/pull 10 pounds occasionally, sit mostly with brief periods of time standing or walking, occasionally reach/handle and finger.

Notably absent from Hartford's analysis was a discussion of the non-strength components of the DOT's definition for this skilled occupation.[12] *See Baker v. Metropolitan Life Ins. Co.*, No. 3:05-cv-

---

[12] As a matter of convenience, non-strength physical aspects of occupations such as postural limitations, visual acuity, etc., and environmental conditions are sometimes referred to as part of the DOT definition. These occupational requirements, however, actually appear in a companion publication from the United States Department of Labor, Employment and Training Administration entitled the SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE DICTIONARY OF OCCUPATIONAL TITLES ("SC") (1993), which provides additional information with regard to every occupation listed in the DOT. *See Carlson v. Barnhart*, 140 F. App'x 29, 37 (10th Cir. 2005); *Williams v. Barnhart*, 424 F. Supp. 2d 796, 800 n.9 (E.D. Pa. 2006); *see also Use of Vocational Expert & Vocational Specialist Evidence & Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p (reprinted at 2000 WL 1898704, at *1 (S.S.A. Dec. 4, 2000)) (ALJs are required to identify and obtain a reasonable explanation for any conflicts between the occupational evidence provided by vocational experts and the "information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), including its companion publication, the SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES (SCO), published by the Department of Labor" and provide an explanation of how the conflict was identified and resolved.). The DOT and SC are considered together in evaluating the demands of an occupation. *See Preslar v. Secretary of Health & Human Servs.*, 14 F. 3d 1107, 1113 n. 2 (6th Cir, 1994); *see also King v. Chater*, No. 96-55012, 1997 WL 330838, at * 2 (9th Cir. June 16, 1997) ("The

262, 2006 WL 3782852, at * 17 (M.D. Tenn. Dec. 20, 2006) ("Although the practice of law is a physically 'sedentary' occupation, the claimant's occupation was in the sophisticated and demanding legal practice of mergers and acquisitions, and the vocational component of MetLife's termination of LTD benefits was arbitrary and capricious because it did not adequately take into account the claimant's cognitive deficits.). The number of hours normally worked by a company president and the stresses attendant to the job's responsibilities were not addressed by Dr. Vita.[13] Plaintiff had been fired by his employer precisely because he lacked the short-term memory necessary to perform the job of company president, not because he lacked the physical strength. In light of this history, Dr. Vita's utter failure to assess plaintiff's nonexertional limitations renders his opinion incredible.

Hartford required plaintiff to apply for social security disability benefits. The Social Security Administration had held that plaintiff was totally disabled and awarded him disability benefits. During the period Hartford paid plaintiff LTD benefits, Hartford had reduced its benefit payments to plaintiff because he was receiving social security disability benefits. The administrator was not bound by the Social Security Administration's disability findings. "This is not to say, however, . . . that the SSA determination is meaningless and should be entirely disregarded."

---

Commissioner routinely relies on these publications in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy.") Even if Hartford had not cited the DOT as part of its basis for denying plaintiff's claim, it would nonetheless have been appropriate for this court to take judicial notice of the DOT and SC in this ERISA context. *See Evans v. Metropolitan Life Ins. Co.*, Nos. 05-5791, 05-6327, 2006 WL 1827704, at * 6 n.7 (6th Cir. June 29, 2006); *accord Osborn v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 299-300 (6th Cir. 2006).

[13]Dr. Vita's opinion does not provide any support for Hartford's vocational determination because he never discussed the duties and demands of plaintiff's occupation as company president. Where such discussion is lacking, it is an indicator that the medical expert did not conduct a reasoned evaluation of whether the individual in question could perform the duties of that occupation. *Elliott*, 473 F.3d at 619.

-54-

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). "The SSA determination to award benefits . . . is . . . just one factor the Court should consider, in the context of the record as a whole, in determining whether [the administrator's] contrary decision was arbitrary and capricious." *Id.* at 295. "[A] decision by a plan administrator to seek and embrace a SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of . . . [a] claim, even if it does not provide an independent basis for rejecting that evaluation.'" 409 F.3d at 295 (quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998)). A "certain skepticism of the plan administrator's decision-making" is warranted. 409 F.3d at 295. Here, skepticism is more than warranted. A comparison of the volume and content of examiner Craven's correspondence and telephone calls to plaintiff regarding plaintiff's social security disability benefits, with the same examiner's letter terminating Hartford's LTD benefit payments without mention of the award of social security disability[14] (AR 2-7), reveals that the latter omission could not have been anything other than intentional.[15] Mr. Craven sought to avoid the very

---

[14]The Social Security Administration had determined that plaintiff was totally disabled applying the familiar administrative test:

> The SSA defines a person as disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, an individual is considered disabled only if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy, regardless of whether such work exists ... where he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

*Wical v. International Paper Long-Term Disability Plan*, 191 F. App'x 360, 368 (6th Cir. 2006).

[15]The Third Circuit's recent decision in *Post v. Hartford Ins. Co.*, No. 05-4927, ___ F.3d ___, 2007 WL 2669825 (3d Cir. Sept. 17, 2007) recognized "a pattern of Hartford being overly aggressive in its attempts to reduce or eliminate Post's disability benefits."

considerable, if not impossible task of reconciling the Administrations's disability finding (from which Hartford had already benefitted financially) and Hartford's determination that plaintiff was capable of performing all the essential duties of his demanding company president occupation. Ignoring the Social Security Administration's disability determination, in a vain hope that a reviewing court would overlook Hartford's deliberate omission, was not "principled reasoning." *Glenn*, 461 F.3d at 666.  The vocational component of Hartford's decision to terminate plaintiff's long-term disability benefits cannot withstand scrutiny under the arbitrary and capricious standard.

B.    Hartford's Denial of Plaintiff's Appeal

On March 15, 2006, Hartford issued its decision denying plaintiff's appeal of Hartford's decision to terminate plaintiff's long-term disability benefits, stating, "It is our determination satisfactory proof of Disability beyond 6/1/05 from Mr. Rabuck's Own Occupation as it is performed in the general workplace and/or as required by his employer has not been provided."  (AR 336).  The Policy defined "Your Occupation" in exact terms:  "**Your Occupation** . . . means your occupation as it is recognized in the general workplace.  Your occupation does not mean the specific job you were performing for a specific employer or at a specific location."  (AR 815).  Thus, Hartford's formulation of an "and/or" test does not comport with the terms of Hartford's own policy.  The issue is whether Hartford arbitrarily and capriciously denied plaintiff's appeal on the basis that on and after June 1, 2005, plaintiff was capable of performing the Essential Duties of his own occupation of company president as it is performed in the general workplace.

1.      Medical Determination

Hartford's letter notifying plaintiff of its denial of his appeal refers to the file review conducted by Dr. Podrid as being "independent."  (AR 335).  As previously stated, there is no evidence that Dr. Podrid's file review was independent.  There is evidence that the University Disability Consortium and Dr. Podrid have supplied Hartford with opinions supporting Hartford's denial of other claims for long-term disability benefits.  On March 8, 2006, Dr. Podrid supplied Hartford with his opinion that the then 58-year-old plaintiff, with a history of an acute myocardial infarction, coma, post-coma short-term memory deficits, placement of a VAD as a bridge to heart transplant, heart transplant with an episode of acute rejection, an extensive  medication regimen to help prevent subsequent rejections, hypertension, elevated cholesterol and triglycerides, gastrointestinal bleeding, and gout, "did not have any active cardiac problems that would limit his functional capacity or result in any restriction of his functional capacity."  (AR 353).

Defendant places great emphasis on Dr. Podrid's letter regarding the purported contents of Podrid's March 6, 2006 telephone conversation with Dr. Deng.   For example, defendant's brief states:

> Dr. Podrid sent a letter to Dr. Deng summarizing their conversation and inviting him to acknowledge his agreement or make changes within one week (AR 355-57).  Dr. Podrid noted that if Dr. Deng did not respond, 'the insurer may rely on this summary in its current form.'  (AR 357).  Dr. Deng did not respond.

(Deft. Brief at 10 n.7).  Defendant's efforts to create an "estoppel by silence" are unavailing.  Dr. Podrid's letter of March 8, 2006, closed with attorney-like paragraphs obviously designed to set up an estoppel argument.  (AR 357).   The purpose of these paragraphs is to  provide Hartford with the basis for asserting that Dr. Deng agreed with Podrid's statements because of the absence of a

response from Deng to the opinions supplied by Hartford's retained expert.  This practice was noted

by the court in *Brenner v. Hartford Life & Acc. Ins. Co.*, No. Civ. A. WMN-00-608, 2001 WL

224826, at * 4 (D. Md. Feb. 23, 2001):

> With Dr. Kerr's [Hartford's expert's] report in hand, Defendant [Hartford] then sought "comments from Dr. Alvin [the treating physician].  When none were forthcoming, Defendant found that Dr. Alvin, by his silence, agreed with the contents of Dr. Kehr's report.

*Id.*  In *Brenner*, the court found that, "Little significance [could] be attributed to Dr. Alvin's

unresponsiveness to Defendant's request for comments as the lack of response could as likely be a

result of inadvertence or inattention due to other pressing demands in the physician's schedule." *Id.*

at * 5 n.10.  Dr. Deng is a cardiologist in the heart transplant team at one of the top medical schools

in the United States.  Without question, Dr. Deng has a schedule of pressing demands[16] that are of

life-or-death exigency.  By March 6, 2006, Dr. Deng also had a fairly well-established track record

of being relatively slow in responding to the insurance company inquiries.  Defendant's brief denies

any bad faith or collusion (Deft. Brief at 22-23), and it proffers two alternative reasons to justify Dr.

Podrid's facially unreasonable demand that Dr. Deng respond immediately.  "For instance, Dr.

Podrid may have wished to have Dr. Deng review the summary while their conversation was still

fresh in his mind.  Or [sic] Dr. Podrid may have been conscious of the ERISA imposed deadlines

on appeals decisions.  29 C.F.R. § 2560.503-1."  (Deft. Brief at 22).  Neither of the alternatives

postulated by Hartford is persuasive.  If Dr. Podrid wanted the conversation to have been fresh in

Dr. Deng's mind, why did he wait two days before sending his fax?  Moreover, it is clear from the

record regarding the extension requested by Dr. Vita and the extension granted by Hartford, that

---

[16]Dr. Podrid was candid to point out Dr. Deng's "busy schedule"in the first sentence of the March 8, 2006 fax.  (AR 355).

Hartford was the entity establishing the short deadlines for its receipt of reports from UDC physicians.

Plaintiff argues that the court should disregard Dr. Podrid's statements regarding the purported content of the conversation with Deng as "inherently unreliable hearsay." (Reply Brief at 7) (citing *Randazzo v. Federal Express Corp. Long Term Disability Plan*, No. 99 Civ. 2895, 2000 WL 20698, at * 3 n.1 (S.D.N.Y. June 11, 2000)). Hartford was not bound by the Federal Rules of Evidence in making its decision whether to grant or deny plaintiff's appeal. In a sense, its entire file is hearsay, although some documents may fall under exceptions to the hearsay rule. Thus, the court will not disregard this evidence on the basis that it was hearsay. For the reasons noted above, however, the recitation in the letter must be deemed manipulative and incredible. Furthermore, the conflict of interest Dr. Podrid was operating under when he wrote down the March 8, 2006 version of what Dr. Deng had purportedly stated during the telephone conversation on March 6, 2006, is a factor to take into account in determining whether Hartford's decision denying plaintiff's appeal was arbitrary and capricious.

Dr. Deng advised Dr. Podrid that plaintiff had returned to work as CEO after his heart transplant surgery. Plaintiff's job involved working up to 80 hours per week and extensive travel. (AR 356). Plaintiff had ended up hospitalized on multiple occasions during the months he was attempting to work after his transplant. Dr. Podrid wrote:

> You told me that the issue about returning [plaintiff] to his full time job as CEO was not based on any physical problems, but was mostly a mental and psychologic issue in that he was not able to work for the long hours required. You concluded by telling me that you felt that Mr. Rabuck could return to his previous job as a CEO but only on a part time basis, avoiding excess hours and travel, and that he could also return to full time work at another job that did not require 80 hours per work [week], but rather the usual 40 hours. However,

you also told me that it was difficult for you to know how much work Mr. Rabuck could actually do.

(AR 356). Whatever was actually said, this "summary" bears no resemblance to Dr. Deng's January 2, 2006 "Statement of Disability" and the restrictions Dr. Deng specified therein. (AR 511-13). Hartford arbitrarily and capriciously disregarded the written statement signed by plaintiff's treating cardiologist in favor of a second hand account of what another doctor retained by Hartford thought he heard Dr. Deng say days earlier during a telephone conversation of unspecified duration.

Hartford's denial of plaintiff's appeal states, "In a 3/14/06 letter Mr. Rabuck's employer advises that he ceased work due to memory loss. Medical evidence to support psychological or cognitive limitations has not been provided for consideration." (AR 336). The first sentence quoted above is a euphemism for plaintiff's firing by Precision Manufacturing because plaintiff's short-term memory and other problems made it impossible for plaintiff to perform his duties as company president. (AR 331). There is no contrary evidence regarding the grounds for termination of plaintiff's employment. Inability to meet the employer's expectations with regard to cognitive functioning was record evidence that Hartford could not dismiss out of hand without being arbitrary and capricious. *See Rochow*, 482 F.3d at 866. Plaintiff's loss of short-term memory is documented as early as 2002 in his Ohio discharge papers following his 2002 heart attack and coma. *See Plummer v. Hartford Life Ins. Co.*, No. C-3-06-94, 2007 WL 43549, at * 24 (S.D. Ohio Jan. 5, 2007) (medical evidence of claimant's history of depression was improperly ignored in the termination of LTD benefits). Hartford had the right, had it chosen to do so, to have plaintiff examined for measurement of the specific level of memory impairment. Hartford ignored the medical records regarding plaintiff's pain and fatigue. Plaintiff's problems with gout and persistent

-60-

edema in his lower extremities were never addressed.  Moreover, Hartford terminated its benefit payments on the basis that plaintiff was not Disabled (AR 804), not because plaintiff had "failed to furnish Proof of Loss, when requested by [Hartford]." (AR 804).  The medical component of Hartford's decision denying plaintiff's appeal was arbitrary and capricious.

### 2.       Vocational Determination

The vocational component of Hartford's denial of plaintiff's appeal requires little discussion.  Hartford primarily relied on Dr. Podrid's report.  There is no evidence that Podrid had any vocational expertise.  Dr. Podrid's March 8, 2006 report incorrectly referred to plaintiff as an "engineer" (AR 345), and thus could not have assessed the potential impact of plaintiff's "high stress" occupation of company president on plaintiff's health.  Plaintiff's treating cardiologist indicated that plaintiff had worked 80-hour work weeks.  Hartford's employee Ms. Fleisher noted that, "Long hours, including evenings and weekends are standard for most top executives." (A.R. 341).  There is no evidence within this record supporting the existence of "part-time" company president jobs.  Hartford's decision on appeal, like its earlier decision terminating plaintiff's LTD benefits, studiously avoided any reference to, or analysis of, the Social Security Administration's finding that plaintiff was totally disabled from performing the requirements of any occupation. Hartford's  decision denying plaintiff's appeal based on its determination that plaintiff was capable

of performing full-time work at his own occupation[17] of company president was arbitrary and capricious.

## III.    Relief

Plaintiff's claim for benefits is brought pursuant to section 502(a)(1)(B) of ERISA, which empowers a participant or beneficiary to sue "to recover benefits due under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The principal relief under this section is an order reinstating benefits and awarding retroactive benefits. *See Glenn*, 461 F.3d at 675 (proper remedy is reinstatement of benefits retroactive to date of improper termination); *accord Wenner v. Sun Life Assur. Co.*, 482 F.3d 878, 884 (6th Cir. 2007). No extra-contractual compensatory damages or punitive damages are allowed. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 215 (2004); *Varhola v. Doe*, 820 F.2d 809, 817 (6th Cir. 1987). The court will therefore order an immediate reinstatement of LTD benefits, beginning with the benefit payable in November 2007.

The court also will enter judgment in favor of plaintiff for benefits retroactive to June 2005 through October 2007. To facilitate the framing of an appropriate judgment, defendant will be directed to file a schedule within fourteen days, setting forth for each month between June 2005 and October 2007, inclusive, the benefit amount payable to plaintiff. In addition, the district court

---

[17]A two-tiered definition of disability is common in LTD benefits policies. *See Wical*, 191 F. App'x at 362-63; *Hulet*, 2007 WL 2875287, at * 1. The vocational test for plaintiff's Disability changed after two years to "one or more of the Essential Duties of Any Occupation." (AR 812). "Any Occupation means an occupation for which you are qualified by education, training or experience and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." (AR 812). *McDonald*, 347 F.3d at 172. Defendant did not present any argument that plaintiff was not disabled under this test.

has discretion to award pre-judgment interest in an ERISA case in accordance with general equitable principles.  *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998).  The court determines that this is an apt case for the award of pre-judgment interest, as plaintiff has been deprived of the use of LTD benefits for years, while the defendant has enjoyed the use of the money during the same period.  The purpose of an award of pre-judgment interest in an ERISA case is to compensate the beneficiary for the lost time value of money wrongly withheld from him, a goal that appears eminently appropriate in this case.  *See Ford*, 154 F.3d at 618; *Dorris v. Cummins Engine Co., Inc. Group Ins. Plan*, 470 F. Supp.2d 797, 821-22 (M.D. Tenn. 2006).  As federal law does not prescribe a rate for pre-judgment interest, the matter is one of trial court discretion.  In this regard, the Sixth Circuit has approved the use of the 52-week Treasury Bill rate prescribed in 28 U.S.C. § 1961 for post-judgment interest as a reasonable guide for the calculation of pre-judgment interest as well.  154 F.3d at 619; *see Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002).

The schedule submitted by defendant therefore shall contain, for each monthly payment, a calculation of pre-judgment interest, using the "stream-of-benefits model" endorsed by the Sixth Circuit in *Caffey*, 302 F.3d at 585.  Under this approach, interest is calculated on each monthly payment of LTD benefits beginning on the date that the payment was due.  *Id.*  Defendant's schedule shall use a blended interest rate of 5.84 percent, which the court has derived by taking the average of all monthly average one-year constant maturity treasury yields from June 2005 to October 2007.[18]  *See Caffey*, 302 F.3d at 585; *Ford*, 154 F.3d at 619.  The court's calculation of the blended

---

[18] The version of 28 U.S.C. § 1961 in effect before December 2000 utilized the average 52-week United States Treasury bill rate.  "Effective December 21, 2000, the statute [28 U.S.C. § 1961] was amended and the language 'the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills submitted immediately prior to' was replaced by 'the weekly average 1-year

-63-

rate is Attachment 1 to this opinion.  The monthly average one-year constant maturity treasury yield was gleaned from the website of the Federal Reserve www.federalreserve.gov.  The court derived the blended rate by adding each average monthly rate, as reported by the Federal Reserve Bank,[19] and dividing the sum by the number of months (29).  The blended rate so derived must then be applied to each retroactive monthly payment, beginning on the due date and running through October 2007, without compounding.  Plaintiff is granted seven days after the filing of defendant's schedule in which to lodge objections to either the benefit amounts or the calculation of interest.  After review of the schedule and any objections, the court will enter judgment for past-due benefits.

After the entry of final judgment, plaintiff may apply for costs and attorney's fees, which the court will consider separately as allowed by Rule 54(d)(2) of the Federal Rules of Civil Procedure.  *See Miltimore Sales, Inc. v. International Rectifier, Inc.*, 412 F.3d 685, 687 (6th Cir. 2005).

### Conclusion

Where an ERISA plan grants the insurer discretion, its obligation is rather easily met -- it must act reasonably and in a principled fashion, and not arbitrarily.  The record presented by Hartford in this case cannot support a finding that it met even this low threshold of care.  Defendant,

---

constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.'" *B.F. Goodrich Co. v. Murtha*, No. Civ. 387 CV 52PCD, 2004 WL 3249236, at * 3 (D. Conn. Aug. 24, 2004) (quoting 28 U.S.C. § 1961, comments).  Because plaintiff's benefits were due on a monthly basis and for purposes of convenience, the monthly average figure from the Department of Treasury is utilized.  Use of a weekly average would result in only a minuscule difference.

[19]The average monthly yield for one-year constant maturity T-bills is not yet available for October 2007, and the court has applied the September 2007 rate in calculations related to this month.

obviously motivated by its own self-interest, engaged in an unprincipled and overly aggressive campaign to cut off benefits for a gravely ill insured who could not possibly have endured the rigors of his former occupation on a full-time basis.  Defendant's decisions, and the methods used to reach them, cannot withstand judicial review, even under the lenient arbitrary and capricious standard.

For the foregoing reasons, the court finds that defendant's decisions to terminating plaintiff's LTD benefits and to deny his appeal were arbitrary and capricious.  Defendant will be ordered to reinstate plaintiff's benefits under the Policy.  Defendant will also be ordered to file a schedule of past-due benefits, along with the calculation of prejudgment interest comporting with the court's opinion, after which the court will enter final judgment.

Dated:  October 30, 2007            /s/  Joseph G. Scoville
                                    United States Magistrate Judge